Jane DOE, Plaintiff,

v.

TRAVELERS INSURANCE
COMPANY, Defendant.

Civil Action No. 95–12432–REK.

United States District Court,
D. Massachusetts.

July 31, 1997.

## OPINION

KEETON, District Judge.

The hybrid nature of this civil action presents jurisdictional issues beyond those that have become common in the growing stream of civil actions arising from benefit claims of varied types under ERISA—regulated benefit plans. *See Recupero v. New England Telephone and Telegraph Co.,* 118 F.3d 820 (1st Cir.1997).

First. Plaintiff invokes an "arbitrary and capricious" standard of judicial review, asking this court to declare that Travelers Insurance Company completely failed to review her claim in compliance with its duty to do so as "named fiduciary" under a Group Life and Health Insurance Plan. She requests also a declaration that this failure was "arbitrary and capricious," prevented her from recover-

ing benefits according to the terms of the company's "employee welfare benefit plan" for her inpatient hospitalization from March 2, 1995 through March 20, 1995, and was thus a violation of her rights under various provisions of the Employee Retirement Income Security Act of 1974, as amended, codified in 29 U.S.C. § 1001 et seq. ("ERISA").

Second. Plaintiff contends that remand to the "named fiduciary" or any alleged successor is impossible because the entity originally designated as "named fiduciary" has ceased to exist and no other entity has been properly designated to succeed it. For this and other reasons, plaintiff asks that this court itself make all needed factual and legal determinations and award her the full insurance benefits she claims, with interest, attorney fees, and other monetary sanctions.

Third. Plaintiff asserts a separate private right of action under § 1132(c), with added relief under 29 U.S.C. § 1132(g)(1).

Under an Order Regulating Nonjury Trial, fashioned by the court in consultation with counsel and in many respects as a stipulation of the parties with approval of the court, evidence and arguments were received in court on four days in April and May 1997 (April 2, April 3, April 15, and May 30, 1997). Extensive written submissions of the parties were filed before Day 1, at intervals during and between Days of trial, and after the completion of in-court proceedings on Day 4, May 30, 1997.

This opinion recites the findings and conclusions of the court and the reasons for the decision to grant relief to the plaintiff on alternative grounds asserted by plaintiff, despite the court's rejection of plaintiff's primary theory of the case and rejection of plaintiff's primary contention regarding the scope of the court's jurisdiction when judicially reviewing decisions of a named fiduciary of an employee benefit plan regulated by ERISA.

## I. Background Facts and Procedural Law

### A. Health Care Services and Bills for Which Claims Are Made

At the time of the events in question, plaintiff was Chairperson and Chief Techni-cal Officer of a "high tech" company that she founded. (Proposed Findings of Fact and Conclusions of Law ¶ 1.)

In early 1995, the plaintiff Doe attended a womens' retreat. In the circumstances of the retreat, she became conscious of memories of being sexually abused by her brother as a child. (Ex. 21 at 1–2.)

As these memories resurfaced, Doe "attempted suicide by walking into the woods on the ground of the retreat during a blizzard." (Ex. 21 at 2.) Doe had a fear of sleeping and could not sleep more than one to two hours each night. (Ex. 21 at 3.) Dr. Nicholson Browning, Doe's psychiatrist of several years, expressed concern and suggested that Doe be hospitalized. (Ex. 21 at 3–4.)

Dr. Browning's influence caused Doe to make an appointment with the Human Resource Institute Hospital ("HRI") and Doe spoke with an HRI employee on February 23, 1995. (Ex. 21 at 4.) Doe testified that:

On Saturday, February 25, 1995, I couldn't write or sleep. I had thoughts that I hate myself and my body, and I wanted to kill myself. I took codeine pills, leftover from an old prescription, in an attempt to sleep for more than two hours at a time without nightmares. On Sunday, February 26, 1995, I took more codeine pills and passed out.

(Ex. 21 at 4.)

Sometime on or before March 1, 1995, plaintiff called Travelers to request pre-approval for an admission to round-the-clock in-hospital treatment at HRI. Acting on what she and her doctors contend was a life-threatening emergency because of concerns about suicidal impulses, she admitted herself to HRI on March 2, 1995. The diagnosis of doctors at HRI was that Doe was suffering from post traumatic stress disorder and major depression. (Ex. 24.) Doe testified that her condition worsened at night and when she was alone. (Ex. 21 at 7.) Doe remained as an in-patient at HRI until March 20, 1995. (Ex. 21 at 5.) I credit her testimony and that of Dr. Browning in making these findings.

Doe was first notified that Travelers' "patient advocate" had denied her claim on

March 3, 1995 by staff at HRI. On that day, a Dr. Stephen Agular was in contact with Doe's attending physician, Dr. Herron, at HRI to discuss the patient advocate's decision to decline coverage. (Tr. at 2–35.) A series of appeals followed.

The first appeal was denied by letter dated March 7, 1995, sent to Doe's residence. (Ex. 7.) The quotation of this letter and others below is literal. I have not undertaken to interrupt or modify the text even where it seems likely that clerical errors occurred.

In the first denial letter, Joan Carew, the patient advocate, said:

> Your appeal of the Patient Advocate determination regarding [Doe] has been completed. The appeal was referred to a Physician Advisor who was not previously involved in the original determination. After review, the Physician Advisor has determined that hospital admission is not medically necessary. Accordingly, hospital expenses will not be covered by your benefit plan.

> The decision not to approve hospitalization was made based on the following rationale: Pursuant to the Travelers' Medical Necessity Guidelines, we are unable to certify the proposed admission because, based on this patient's clinical situation, the services proposed could be rendered in a less intensive or more appropriate alternative setting. We suggest that you review this decision with your physician. The final decision to receive services of course rests with you and the physician.

> We would note that these reviews do not determine whether benefits are available for a particular expense. Whether benefits are available is of course subject to:

> —the patient's coverage being in force at the time services are rendered.

> —all plan exclusions, limitations, and conditions.

> Our recommendation is based on the information received by the Physician Advisor. A review of the medical information will be conducted after submission of the claim. If this review does not support the information received by Patient Advocate and indicates the hospitalization is not medical-

ly appropriate, payment for expenses may not occur. If you have any questions regarding this decision, or the appeals process please do not hesitate to contact us . . . .

(Ex. 7.)

On March 7, 1995 another doctor, Dr. Samet, was in contact with Dr. Herron about Doe's claim. (Tr. 2–35.) A second appeal was denied by letter sent to Doe's residence on March 8, 1995. (Ex. 8.) The content of the second denial letter is substantially the same as that of the first denial letter, except that the term "re-appeal" is used and the first sentence in the last paragraph reads, "[t]his letter documents that the final level of appeals has been completed." (Ex. 8.)

A third doctor, Dr. Himber, was in contact with Dr. Herron on March 8, 1995. (Tr. 2–37.) Letters appealing the denial of benefits were sent by Dr. Browning, (Ex. 9.), Dr. Herron, (Ex. 10), and Dr. Lisa Wolfe, the attending psychologist at HRI, (Ex. 10). Doe also sent a letter of appeal. (Ex. 11.)

Doe stated in her direct testimony that, sometime during her stay at HRI, the staff there informed her that Travelers had offered to pay for a partial-hospitalization program. (Ex. 21 at 7.) This type of partial-hospitalization program treats a patient as an inpatient during the day, but not on nights or weekends. (*Id.*) Doe was told by Dr. Browning that such treatment was inappropriate because Doe was a danger to herself on nights and weekends when she was alone. (*Id.*)

On April 14, 1995, Riva White of The Travelers sent a letter to Drs. Herron and Wolfe stating the following:

> This is to acknowledge receipt of your correspondence of April 4, 1995 regarding the above confinement [of Doe.]

> Please send the *entire* patient medical record to me at the address listed at the bottom of this correspondence. In order to reassess medical necessity the following information will be required:
> * admission history and progress notes
> * physician's orders
> * interdisciplinary progress notes
> * nursing notes

* discharge summary and discharge plans
* medication sheets
* lab reports
* psychological testing

This information is required before consideration can be given to this appeal. Thank you for your assistance.

(Ex. 12.)

The third appeal resulted in approval for payment for two of the days Doe was hospitalized at HRI, but reaffirmed the denial of payment for the remainder of the stay. In a letter from Edie Belanger, RN to Dr. Herron, Travelers wrote:

This is in response to your letter of appeal of the denial of the above referenced confinement [of Doe.] Notification was made to Patient Advocate on 3/1/95, at which time the concurrent review process was initiated. Based upon the clinical information provided by the attending physician to our board certified physician reviewed on 3/3/95, this admission was determined not to be medically necessary. The attending physician was advised of this denial at the time the review occurred with the physician advisor. In addition, the determination was upheld on two levels of appeal by two additional psychiatric MD reviewers. A retrospective chart review has been conducted per your request to appeal the decision made by Patient Advocate to deny treatment. This entire case was again reviewed. The clinical data supports the need for a brief inpatient confinement to evaluate the risk of self harm, to provide stabilization, and to arrange for appropriate aftercare. Therefore, 3/2/94 [sic] through 3/3/94 [sic] have been approved as medically necessary. The medical necessity for continued inpatient treatment was not substantiated for the remainder of the treatment period. Upon admission, and for the duration of the hospitalization, the documentation reflects that the patient expressed no further suicidal ideation. A nursing note on 3/3 indicates that the patient was "able to contract for safety" and "Seems in good spirits." On 3/4, an MD note states "not c/o SI." On that same day the patient was allowed a pass in order to have dinner with friends which "went well." On 3/5, the patient "Reports good day, less (arrow down) depressed." The patient did experience episodes of anxiety while in the hospital, but did not engage in any self destructive acts. The medical record shows that she had passes ordered of increasing duration almost every day of her hospitalization beginning on 3/3/95.

The letters of appeal were also considered. No new clinical information was provided that had not already been considered during the concurrent review process. The patient was not acutely suicidal, homicidal, or psychotic. She was cooperative and invested in treatment. Once the patient's safety was established, the rationale cited for the utilization of the inpatient setting is not justified. Treatment issues would have been most appropriately addressed in an intensive outpatient setting.

(Ex. 13.)

A fourth appeal letter, dated August 10, 1995, was sent to Dr. Herron by Jane Megson. Travelers states that the content of this letter was based on a report prepared by a Dr. Zucker as part of Travelers' review. (Aff. of Jane Megson at 3.) The text of the letter is as follows:

This letter is in response to your appeal, and the appeals of Lisa Wolfe, Ph.D., W. Nicholson Browning, M.D., and [Doe]. These letters appealed the determination to deny benefits on the above confinement after March 3, 1994.

As you are aware, this admission was pre-certified by the Patient Advocate Utilization Review Program and was determined to be not medically necessary. That determination was upheld on two levels of appeal. The patient elected to proceed with the admission.

The entire medical record and all the letters of appeal were reviewed by a board certified psychiatrist. It is the recommendation of the psychiatrist that the partial denial be upheld and is based on the following findings:

The patient is a 36 year old female admitted to a psychiatric inpatient program for increasing depression with suicidal idea-

tion. Impulsive behavior and increasing symptoms of Post Traumatic Stress Disorder. She had been in treatment for almost two years for depression after having Grave's disease. Her situation worsened after a retreat in January, 1995 where she began to recall memories of past abuse. The reported nightmares, increased anxiety, decreased appetite, and further depression two weeks prior to admission. She reported feeling unsafe when alone and "flooded with images of cutting herself." She reportedly took some extra codeine "to escape and help sleep." There is no mention that this was a suicide attempt on admission, however this was referred to as a suicide attempt later in the chart. There was no plan, there were no other indicators of severe dangerousness. Medical factors include a history of Grave's Disease and being on thyroid replacement, hiatus hernia and back pain. She had apparently refused antidepressants as an outpatient.

The physical exam done on the day after admission noted "no SI/HI." It appears to refer to two possible prior suicide attempts and a rape at age 21 but these are not mentioned anywhere else in the record. On 3–2 a nursing note states "pleasant on approach." Further history on 3–3 indicates a cousin with PTSD. The patient refused medication again at this time. On 3–5 a note states "not complaining of suicidal ideation." Dr. Wolfe charts "suicide ideation and gestures over past week could not have been contained as an outpatient." The patient did report previous thoughts and urges to cut herself but had not acted on these. At the same time that Dr. Wolfe feels that the patient is dangerous and in need of inpatient status she writes: "discussed her sense of discrepancy between competent outer self-representation and inner as frightened and needy." The patient began taking passes from the hospital on 3–3. On 3–6 nursing notes "denies urges to strike out" and "having a good day," while Dr. Wolfe reports "anxious, agitates and would likely act out without inpatient." On 3–7 Dr. Herron agrees that suicidal ideation is not active but "worrisome." Later the patient agreed to Zoloft.

The patient over the next few days was described as social, active, sleeping better. One 3–13 Dr. Wolf wrote "doing better overall." The patient expressed she is looking forward to discharge. On 3–15 she tool a walk in a deserted park and staff writes "patient feels she need to act out in order to illicit concern." Until the patient is discharged, she is granted lengthy passes. The nurses note the patient is doing well but Dr. Wolfe states: "still in need of hospital of hospital [sic] due to shakiness regarding ability to control suicidal impulses;" she then writes a ten hour pass.

Dr. Browning's letter states: "she was flooded with affect and difficult to contain." However, this does not provide rationale for hospital level of care. Dr. Herron's letter relates that on 3–8 the patient "felt suicidal and unsafe to leave." At the same time the patient was being allowed to leave the unit. Dr. Wolfe in her letter states the patient needed to learn "not to act out." However, the chart only shows one example of the patient acting out and that was after she had been there for quite some time. She also refers to the nurse's note quotes by the reviewer noting "good spirits" and feels that she knew the patient better. There are many entries in the chart by various staff at various times that show the patient was not suicidal, not depressed, and not impulsive or in danger. Despite Dr. Wolfe's and Dr. Herron's statements about their concerns of dangerousness, off unit passes were granted during these times.

Based on the documentation provided, the physician reviewer did not find that there was medical necessity for inpatient care after 3–3–95. The record failed to describe or support the symptoms, risk factors or evaluations which would provide such indications. The patient could have been treated at a lower level of care after 3–3–95.

Therefore, the determination will continue to be upheld.

(Ex. 35.)

During the appeals process, all correspondence received by Doe and her doctors was

either on Travelers' letterhead (Exs. 7, 8, 12, 35) or not on letterhead at all (Exs. 13 and 17.).

Doe seeks $23,456.04 for the unpaid benefits related to her inpatient hospitalization at HRI, $38,100.00 for failure to disclose under 29 U.S.C. § 1132(c), costs and attorneys fees, and an injunction prohibiting Travelers from relying on the Medical Necessity Guidelines until those Guidelines are disclosed to all plan participants.

## B. Key Provisions of the Employee Benefit Plan

The Traveler's Plan under which Doe was covered went into effect on July 1, 1992. (Ex. 1 at 5.) The Plan covers in-patient hospitalization for "Mental or Nervous Disorders." (Ex. 1 at 6.)

The Plan documentation for "Utilization Review" contains details about procedures. (Ex. 1 at 7.) The Patient Advocate is defined as a "program which performs a Utilization Review for the Company." (Ex. 1 at 37.)

The Plan covers only charges for services that are deemed to be "medically necessary" by a Patient Advocate; the plan specifically excludes coverage for "service or supplies which are not Medically Necessary, including any confinement, treatment, service or supply given in connection with a service or supply which is not Medically Necessary." (Ex. 1 at 7–8, 20.) An amendment to the plan specifies that the Patient Advocate is to determine whether services or supplies are medically necessary. (Ex. 4 at 3.)

The Plan definitions section declares the following in defining "medically necessary:"

The Company determines, in its discretion, if a service or supply is medically necessary for the diagnosis or treatment of an accidental injury or sickness. This determination is based on and consistent with standards developed, in part, with consideration to whether the service or supply meets the following:

* It is appropriate and required for the diagnosis or treatment of the accidental injury or sickness.

* It is safe and effective according to accepted clinical evidence reported by gener-

ally recognized medical professional or publications.

* There is not a less intensive or more appropriate diagnostic or treatment alternative that could have been used in lieu of the service or supply given.

(Ex. 1 at 35–36.)

The Plan sets up a procedure for appeal and review of coverage decisions, providing:

The Company [Travelers] will serve as the final review committee under the Plan to determine for all parties all questions relating to the payment of claims for benefits under the Plan and shall notify you in writing about the decision on your review. The Company has the discretion to construe and interpret the term of the Plan and the Authority and responsibility to make factual determinations. The provisions of the Plan require you to appeal any claim denial as described above before seeking other legal means.

(Ex. 1 at 1.)

## C. Applicable Law

The parties agree that the Plan under which Doe seeks benefits is an employee welfare plan, as that term is defined in ERISA. (Proposed findings of fact and conclusions of law ¶ 10.)

Also not disputed is the fact that Travelers is the named fiduciary, as well as the plan administrator, and the entity authorized to make claim decisions. (Proposed findings of fact and conclusions of law ¶¶ 11, 12.)

ERISA contains a mechanism for a plan beneficiary to challenge denials of plan benefits in 29 U.S.C. § 1132(a)(1)(B), which provides that:

A civil action may be brought—

(1) by a participant or beneficiary—

A) for the relief provided for in subsection (c) of this section, or

B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

A district court reviews ERISA claims arising under 29 U.S.C. § 1132(a)(1)(B) de

novo unless the benefits plan in question confers upon the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Recupero,* 118 F.3d at 823–28. The *Firestone* rule has been interpreted to mean that if a benefits plan clearly grants discretionary authority to the administrator to make interpretive or coverage decisions, the administrator's decisions will be accorded the deferential, arbitrary and capricious, standard of review. *See Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 583 (1st Cir.1993).

■ A plan decision may be found to be arbitrary and capricious if it is "downright unreasonable," *Brehmer v. Inland Steel Industries Pension Plan,* 114 F.3d 656, 660 (7th Cir.1997). Conversely, "[i]f the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, then the administrator's decision is final." *Loyola Univ. of Chicago v. Humana Ins. Co.,* 996 F.2d 895, 898 (7th Cir.1993).

With these broad guidelines as necessary background, the court next proceeds to examine the specifics of Travelers' decisionmaking.

## II. Travelers' Decisionmaking

### A. Heightened Scrutiny for Conflict of Interest

The Supreme Court in *Firestone* held that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone,* 489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). *See also Recupero,* 118 F.3d at 827.

In *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), the Court of Appeals for the Eleventh Circuit determined that a heightened arbitrary and capricious standard must be used when a benefits plan is admin-

istered by an insurance company that pays benefits out of its own assets. This heightened scrutiny is appropriate "[b]ecause an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." *Id.* at 1561. Thus, in *Brown* the Eleventh Circuit held that a disinterested, impartial administrator is entitled to great deference, but that an administrator with a conflict of interest receives less deference, even under an arbitrary and capricious review. *Id.* at 1564.

Although the First Circuit has not yet made such a determination, I conclude that it is likely that this Circuit will hold, when directly confronted with a need to decide, that a conflict of interest that Travelers had in this case would lead to giving "more bite" to the arbitrary and capricious standard, as this point was expressed in *Chojnacki v. Georgia–Pacific Corp.,* 108 F.3d 810, 815 (7th Cir.1997).

■ The conflict of interest is affected in this case, in ways not entirely clear, by the delegation of decisionmaking authority to entities other than Travelers, as discussed in Part III below. It is clear, however, that even before any delegation by Travelers, in the distinctive circumstances of this case Travelers and its employed representatives were acting in ways that placed Travelers, the named fiduciary of the plan, in an added role as the entity that might gain financially from decisions against Plan beneficiaries. I conclude that even before delegation, Travelers was in a conflicting position that would have justified a heightened arbitrary and capricious review under *Firestone* and *Brown.*

Also, the court must take into account the fact that Travelers, in arguing that its actions with regard to the delegation were proper, claims that it kept the ultimate fiduciary duty and was still responsible for payment of claims after it delegated decision making authority to MetraHealth. (Travelers' Post–Trial Br. at 20.) Thus, Travelers continued to be in a position of conflict after the delegation.

I conclude that enough evidence of a conflict of interest is before the court in this trial record to support its being considered as a factor weighing toward a more probing review, under the test explained by the Court in *Firestone,* to determine whether Travelers' actions were arbitrary and capricious.

## B. Failure to Give Notice and Provide Opportunity for Hearing

29 U.S.C. § 1133 requires:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Also, 29 C.F.R. § 2560.503–1(f) provides that:

> Content of notice. A plan administrator or, if paragraph (c) of this section is applicable, the insurance company, insurance service, or other similar organization, shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:
> (1) The specific reason or reasons for the denial;
> (2) Specific reference to pertinent plan provisions on which the denial is based;
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

The record discloses that Travelers never gave notice to plaintiff at any time that she would be allowed to submit evidence (either orally or in writing) or make arguments (orally or in writing) in seeking reconsideration of the grounds of decision.

On June 21, 1995, however, Doe sent the following letter to Travelers:

> Dear Ms. Belanger:
>
> After an extensive review of my medical status, our health insurance policy, and the information you sent us regarding the reasons for failing to pay the claim for my hospitalization I have been unable to understand the rationale for this action. All the medical and insurance specialists I have consulted agree that there is no basis for this rejection. Dealing with this issue has caused me severe emotional stress, therefore I would like to resolve the issue directly with you. First, I would appreciate it if you would send me a copy of the medical reviewers report which was the basis for the decision to cover the initial days. I will review it with my physician to see whether there is, any chance that we overlooked some rational basis for your decision. I would also welcome a discussion with you regarding the situation if you have any additional information that would persuade me that your decision is reasonable and consistent with my health insurance plan.
>
> If these efforts yield no additional information, or if you do not respond to my request I will have no choice but to seek legal advice on how to best resolve this matter and limit any further stress this issue is continuing to cause. I can be reached at home at [redacted] or through my voice mail box at [redacted].
>
> I look forward to hearing from you and resolving this issue.

(Ex. 18.) Doe did not receive a response to this letter. The only correspondence sent by Travelers to Doe or her doctors after Doe's letter of June 21, 1995 is the August 10, 1995 letter from Jane Megson to Nan Herron.

Travelers argues that plaintiff never requested a hearing or an opportunity to present evidence or argument. Even if she had some procedural rights, the argument goes, she is barred from complaining now because she never asked Travelers to recognize them.

One difficulty the court has in accepting Travelers' position is that Travelers' argument fails in any way to take account of plaintiff's claim of diminished capability of dealing with the sources of stress that accounted for her need of treatment in a setting involving some degree of control over her freedom, especially in evenings and nights when she would be least likely to be either capable of obtaining help or capable of functioning normally and rationally without help.

I conclude that plaintiff, in the nonjury trial before this court, has offered evidence sufficient to support a finding, and I find, that Travelers, in the letters of March 7 and March 8, did not provide her with notice of the type required by ERISA and by regulations under ERISA.

## C. Medical Necessity Guidelines

ERISA requires that plan fiduciaries provide pertinent documents and information to plan beneficiaries.

29 C.F.R. § 2560.503–1(g) provides that:

Review procedure.

(1) Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained. Every such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may:

(i) Request a review upon written application to the plan;

(ii) Review pertinent documents; and

(iii) Submit issues and comments in writing.

(2) To the extent that benefits under an employee benefit plan are provided or administered by an insurance company, insurance service, or other similar organization which is subject to regulation under the insurance laws of one or more States, the claims procedure pertaining to such benefits may provide for review of and decision upon denied claims by such company, service or organization. In such case, that company, service, or organization shall be the "appropriate named fiduciary" for purposes of this section. In all other cases, the "appropriate named fiduciary" for purposes of this section may be the plan administrator or any other person designated by the plan, provided that such plan administrator or other person is either named in the plan instrument or is identified pursuant to a procedure set forth in the plan as the person who reviews and makes decisions on claim denials.

ERISA also specifies that:

(a)(1) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b) of this section, shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title. . . .

(b) The plan description and summary plan description shall contain the following information:

The name and type of administration of the plan; in the case of a group health plan (as defined in section 1191b(a)(1) of this title), whether a health insurance issuer (as defined in section 1191b(b)(2) of this title) is responsible for the financing or administration (including payment of claims) of the plan and (if so) the name and address of such issuer; the name and address of the person designated as agent for the service of legal process, if such person is not the administrator; the name and address of the administrator; names, titles, and addresses of any trustee or trustees (if they are persons different from the administra-

tor); a description of the relevant provisions of any applicable collective bargaining agreement; *the plan's requirements respecting eligibility for participation and benefits;* a description of the provisions providing for nonforfeitable pension benefits; *circumstances which may result in disqualification, ineligibility, or denial or loss of benefits;* the source of financing of the plan and the identity of any organization through which benefits are provided; the date of the end of the plan year and whether the records of the plan are kept on a calendar, policy, or fiscal year basis; the procedures to be followed in presenting claims for benefits under the plan including the office at the Department of Labor through which participants and beneficiaries may seek assistance or information regarding their rights under this chapter and the Health Insurance Portability and Accountability Act of 1996 with respect to health benefits that are offered through a group health plan (as defined in section 1191b(a)(1) of this title) and the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title).

29 U.S.C. § 1022.

Disclosure requirements are stated also in federal regulations that provide:

*The following information shall be included in the summary plan description* of both employee welfare benefit plans and employee pension benefit plans, except as stated otherwise in paragraph (j) through (n): ...

(j)(2) For employee welfare benefit plans, it shall also include *a statement of the conditions pertaining to eligibility to receive benefits,* and a description or summary of the benefits. In the case of a welfare plan providing extensive schedules of benefits (a medical care plan, for example), only a general description is required if reference is made to detailed schedules of benefits which are available without cost to any participant or beneficiary who so requests;

(1) For both pension and welfare benefit plans, *a statement clearly identifying cir-*

*cumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide* on the basis of the description of benefits required by paragraphs (j) and (k) of this section.

29 C.F.R. § 2520.102–3 (emphasis added).

In addition to the automatic disclosure requirements, ERISA requires that:

The [plan] administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, *or other instruments under which the plan is established or operated.*

29 U.S.C. § 1024(b)(4).

■ Plaintiff contends that Traveler's failed to produce the "Medical Necessity Guidelines" used by Travelers to make its claims decision. This procedural unfairness, Doe contends, kept her from being able to perfect her appeal. Doe alleges that, had Travelers produced this document during the period when she was appealing the initial claims decision, she and her doctors could have provided the information necessary to persuade Travelers that the claim should be paid.

Defendant argues that plaintiff is in no position to complain about defendant's failure to produce the "Medical Necessity Guidelines" because "the medical necessity guidelines were not clearly requested before this litigation commenced." (Tr. 1–27).

Travelers' contention is vulnerable in two respects.

First. The plaintiff requested the information in a letter dated June 21, 1995. (Ex. 18.) Although the plaintiff did not, and of course could not identify the specific documents she was requesting, she did ask "if you would send me a copy of the medical reviewers report which was the basis for the decision to cover my initial days." (*Id.*)

Second. Travelers, as the named fiduciary, also had an obligation to state not only its decision regarding the claim but as well a reasoned basis for its decision. *See* 29 C.F.R. § 2560.503–1(f). Fulfilling these obligations necessarily required that the named fiduciary's interpretation and application of the Medical Necessity Guidelines be a part of the report of its decision.

Travelers' failure to provide Doe with the Medical Necessity Guidelines resulted in a fundamental unfairness of the procedure used to evaluate her claim and the ensuing appeal. I conclude that this failure renders Travelers' decision to deny benefits arbitrary and capricious.

### D. Violations of Law with Respect to Procedural Fairness

I conclude that the deficiencies in fair process identified in II.A, II.B, and II.C above, separately and, more compellingly together, require that the decisions of the named fiduciary be set aside as arbitrary and capricious.

### III. An Alternative Ground for Finding for the Plaintiff

■ An alternative theory, as well, supports this court's conclusion that plaintiff Doe is entitled to some form of relief. Travelers delegated the authority given to it to make determinations under the plan to MetraHealth and in the course of implementing that delegation impaired plaintiff's rights under the plan.

At an early stage, Travelers contracted with MetraHealth for that entity to perform reviews and make decisions that Travelers had undertaken by contract with the plaintiff's employer to perform and, of course, to perform in accordance with the contractually applicable "good faith" standard quite apart from whether ERISA mandates, expressly or impliedly, any standard of performance more demanding of Travelers. (Ex. 41.) Travelers does not dispute that it ceased to do the decisionmaking of individual claims and delegated that function to another entity on January 3, 1995. (Tr. 1–32.) Yet, Travelers now argues that it retained the ultimate decisionmaking authority and thus did not truly delegate its fiduciary responsibilities.

(Travelers' Post–Trial Brief at 20.) If it did not delegate them, Travelers had an ongoing responsibility that it disabled itself from discharging. Thus, Travelers is legally responsible whether or not it delegated decisionmaking authority to MetraHealth.

An issue is presented also as to whether MetraHealth, in turn, delegated or attempted to delegate part of the claims decisionmaking authority to a company called "Core, Inc." It appears from the record that MetraHealth contracted with Core, Inc. to provide doctors to evaluate claims. (Aff. of Matthew Friedman at 2–3.)

ERISA allows a named fiduciary under an ERISA—regulated plan to delegate authority and responsibility, such as authority and responsibility to exercise discretion in making decisions regarding benefits eligibility, to persons other than the named fiduciary. 29 U.S.C. § 1105(c)(1) provides that:

> (1) The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.

The Court of Appeals for the First Circuit has recognized a relationship between the application of this statutory provision and the degree of scrutiny required of a court engaged in judicial review of an out-of-court ERISA decision. In *Rodriguez–Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580 (1st Cir.1993), the Court of Appeals for the First Circuit considered the effect that an improper delegation of the authority to make discretionary plan decisions would have on judicial review of those discretionary decisions.

The Plan in *Rodriguez–Abreu* did not contain an express provision allowing the fiduciary to delegate its responsibilities. In *Rodriguez–Abreu,* the plan administrator, not the named fiduciary, made a claims decision despite the absence of an express intention on the part of the fiduciary to delegate the fiduciary authority. *Id.* The court concluded:

To be an effective delegation of discretionary authority so that the deferential standard of review will apply, ... the fiduciary must properly designate a delegate for the fiduciary's discretionary authority. *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283–84 (9th Cir.1990).... Because the relevant plan documents did not grant discretionary authority to the Plan Administrator and the Named Fiduciaries did not expressly delegate their discretionary authority to the Plan Administrator, we find that the district court correctly employed the de novo standard of review.

*Id.* at 584.

■ Thus, the holding of *Rodriguez–Abreu*, and cases decided by other Courts of Appeals, is that when the decision to deny benefits is made by a person other than the named fiduciary, or someone who has been given discretionary authority to make plan coverage decisions, a court must review any such decision de novo. *See also Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 229 (2d Cir.1995).

Travelers does not identify, and the court has not located, language in the plan, or the amendments to the plan, that expressly provides for a procedure for the named fiduciary to designate persons other than the named fiduciary to carry out the fiduciary's responsibilities. Travelers admits that it transferred the authority to make decisions regarding Doe's insurance coverage to MetraHealth on January 3, 1995. (Aff. of Matthew Friedman ¶ 4.)

I conclude that Travelers did not comply with the requirements of 29 U.S.C. § 1105(c) because Travelers delegated its authority to make decisions under the plan to another entity and the plan did not expressly provide that such a delegation was allowed. Thus, under *Rodriguez–Abreu*, the de novo standard applies to any out-of-court decisions made by MetraHealth.

Further support for this conclusion appears when one examines the Supreme Court's reasoning in *Firestone*. Under *Firestone*, if a benefits plan expressly provides the fiduciary with discretionary authority to decide, judicial review of a benefits decision

under the plan is usually limited to determining whether the decision was arbitrary and capricious. The distinction between plans that do and plans that do not include express provisions for discretion is one of substantial consequence for a plan beneficiary. It is a paramount responsibility of a court to examine plan provisions closely to determine whether discretionary authority was in fact clearly given and properly implemented.

In the present case, not only was the delegation and redelegation of the discretionary authority done outside the bounds of 29 U.S.C. § 1105(c). Also, it was not disclosed to the plaintiff at all. The fact that delegation had occurred was also obscured by misleading letterheads. The letters the plaintiff received from the decisionmaker, MetraHealth, were on Travelers' letterhead or on no letterhead at all. (Exs. 7, 8, 12, 13, 17.) It was only through discovery in this case that Doe discovered that decisionmaking authority had been transferred. (Aff. of Jane Doe in Response to Aff. of Matthew Friedman at 3–5.)

The method and effect of this delegation is troublesome for a number of reasons. First, and most importantly, the plaintiff in this case contracted with Travelers, through her employer, and gave Travelers the right to review the medical treatment she received to determine if it was "medically necessary." In so doing, the plaintiff entered into an arrangement under which judicial review would be limited to determining whether benefit decisions were arbitrary and capricious. In such an arrangement the identity and reputation for reliability of the other party were extremely important. Doe and her employer were choosing to deal with Travelers, not some unknown entity to which Travelers might delegate.

Doe and her employer had at least some opportunity to negotiate with Travelers before entering into an agreement to give Travelers discretionary authority to make benefits decisions. Neither Doe nor her employer had the opportunity to go through a like process of thoughtful bargaining with MetraHealth.

I conclude that circumstances such as these are not the type of bargained-for consent to which the Supreme Court referred when it held that a plan beneficiary who has given the plan fiduciary the discretion to make a benefit decision is entitled to judicial review only to determine whether benefit decisions are arbitrary and capricious. Instead, *Firestone* supports the conclusion that when a beneficiary has made a calculated decision to allow the plan to be the final arbiter of benefits decision, and when the entity to whom the beneficiary gave this power in fact makes such a decision, then, and only then, is that decision entitled to the highly deferential review to determine whether it was arbitrary and capricious. If the entity that makes plan determinations is not the entity to whom the beneficiary gave discretionary authority, and if the delegation was not done pursuant to 29 U.S.C. § 1105 and a specific agreement between the beneficiary and the plan, then *Firestone* does not direct such a highly deferential standard of review.

This is not to say that a trial court is vested with plenary authority to decide anew all issues of fact and evaluation that are material to a denied claim for benefits. Precedent does establish, however, that a reviewing court may give less deference to the out-of-court decisionmaker in this situation. *See Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–57; *Recupero*, 118 F.3d at 827–28.

■ Applying this less deferential rule regarding review, I conclude that the factors recited by MetraHealth in denying Doe's claim were insufficient to justify the decision. It was an abuse of discretion to disregard the compelling evidence of Doe's inability to cope with her memories, and her particular inability to deal with her emotional state during nights and weekends, when she was alone. The actions of Travelers and MetraHealth were arbitrary and capricious.

### IV. Considerations Bearing on Remand as a Remedy

#### A. Remand as the Preferred Remedy for Procedural Error

■ Remand to the named fiduciary is ordinarily the appropriate remedy when an out-of-court decision of a claim for benefits under an ERISA—regulated employee benefit plan is subject to judicial review and the reviewing court determines that the process by which the decision was made failed to measure up to the requirements of procedural fairness. *Recupero*, 118 F.3d at 830–31.

#### B. Exceptions to Remand as a Remedy for Procedural Error

■ Though remand is presumptively the appropriate remedy for procedural error that deprives a claimant of fair process, exceptions are recognized. *Id.* at 839–40.

One of the recognized exceptions is that if, in the circumstances of the particular case, remand would be futile because of demonstrated conflict of interest of the named fiduciary, some other remedy is essential to fair outcome on the merits. *Id.*

Another exception applies when changed circumstances have caused the named fiduciary to be no longer capable of discharging the function of reconsideration of the merits of the claim. For reasons Explained in Part V.B, I have determined that changed circumstances shown of record in this case foreclose remand to the named fiduciary as a viable option.

In Part V, below, this opinion addresses the remaining alternatives a court may consider in such circumstances as are presented in this case.

### V. Alternatives Remaining as to Form of Relief

#### A. A Question Regarding the Court's Role in Judicial Review

After an introductory colloquy initiated by the court to assure no misunderstanding about the nature of the particular form of non-jury trial occurring in this case, the court received in evidence a stipulation of the parties as to the "Administrative Record," Docket No. 62, filed March 6, 1997. "Administrative Record" is somewhat misleading if not an outright misnomer in this case, because of the connotation that it is a record of out-of-court proceedings before an administrative agency of some branch of govern-

ment—national, state, or local. In fact, the record of out-of-court proceedings in this case is a record of proceedings before a private entity, the "named fiduciary" or a person or entity delegated by the "named fiduciary" to perform its function. For convenience, however, the court accepts the parties' designation of Docket No. 62 as the "Administrative Record" for purposes of this case.

The court received Docket No. 62 "in evidence" on Day 1 (Tr. 1–8, 1–41 through 1–48), without deciding at that time whether the court would consider this and other materials "in evidence" for the purpose of making "de novo fact-findings" or instead for a different purpose associated with judicial review of out-of-court decisions of others. (Tr. 1–5 through 1–8).

A footnote to the stipulation explained the scope of the stipulation of the parties and each party's reservation:

By agreeing to the inclusion of these documents, Doe is not thereby agreeing that no dispute exists as pertains to the content or truthfulness of all statements made in the documents generated by Travelers or United Healthcare.

By agreeing to the inclusion of these documents, Travelers is not thereby agreeing that no dispute exists as pertains to the content or truthfulness of all statements made in the documents generated by Jane Doe, or those acting on her behalf.

(Docket No. 62, n. 1.)

In addition to the footnote, which was appended to the first sentence quoted below, three introductory paragraphs that preceded the listing of Exhibits explained the stipulation:

Plaintiff Jane Doe ("Doe") and Defendant Travelers Insurance Company ("Travelers") have agreed that certain documents are properly part of and are to be included in the administrative record on appeal. Those documents are listed as Exhibits 1 through 20 in part I below. There are additional documents sought to be included in the administrative record by the parties, to which the parties cannot agree. Doe's proposed additional portions

of the record are listed as Exhibits 21 through 28 in part II hereof and Traveler's proposed additional documents are listed as Exhibits 29 through 40 in part III hereof.

In addition, Doe continues to maintain that she is entitled to present evidence and live testimony at a trial of this matter concerning, *inter alia*, the medical necessity of plaintiff's hospitalization, the adequacy of the defendant's investigation, the adequacy of the administrative record, defendant's alleged breach of fiduciary duty, and defendant's alleged ERISA violations.

Travelers continues to maintain that its claims decision was reasonable and proper based on the information before it. Moreover, Travelers contends that it had a rational basis for its decision, and ... [that] therefore, it did not act in an arbitrary or capricious manner.

Docket No. 62, pages 1–2 (footnote omitted).

After hearing plaintiff's opening statement and before calling on defense counsel for his opening statement, the court asked attorneys on both sides a question about whether it would be appropriate for the court to act as a "de novo finder of fact," even if the court should decide that defendant had failed to act properly, and could not now do so on remand because of defendant's disabling itself from reconvening the appropriate decisionmaking entity. In part, the colloquy was as follows:

THE COURT: Now, you have defined in the submission that you're placing before me what the judgment, what the amount of the judgment would be in those circumstances?

MS. HESSE: Yes, your Honor. In our findings of fact and conclusions of law we have put in evidence of exactly what the damages would be and what the amount—

THE COURT: Are they precisely calculable under a benefit system or is there some further decision-making? Now, you see, if there's some further fact-finding decisionmaking that has to be done, I'm still troubled about whether it's proper for me to do it.

MS. HESSE: There's no additional fact-finding or decision-making that would need to be done other than on the additional

request for supplementing the benefits money that she is out with costs and attorney's fees and the like, which obviously would have to be put before your Honor in an application for same. But other than that, your Honor, we believe that on the record there is—copies of her hospital bills are in the record so that it is clear how much money is at stake. There is also a very clear statutory penalty in the statute of a hundred dollars a day for failing to disclose information and your Honor has the discretion to order that $100–a–day penalty for each day that the information was not disclosed an the information requests and the failure to disclose are all on the record as well, your Honor.

THE COURT: All right. Now I'll hear from defense counsel.

And one question I want you to answer for me is why should I not receive in evidence proposed Exhibits 21 through 28 not as a basis for my making de novo findings of fact about the disability or the need for the hospitalization, but for the purpose of determining whether the defendant is in violation of its fiduciary obligations and, if so, what kind of remedy I should fashion. So that Exhibits 21 through 28 would be received in evidence as a part of the record before this Court as distinguished from a part of the record of the decision-making, private decision-making that had preceded the matter coming to this Court

MR. O'LEARY: Well, your Honor, it is Travelers' position, that—well, number one, the medical necessity guidelines were not clearly requested before this litigation commenced.

THE COURT: Requested by whom?

MR. O'LEARY: The plaintiff.

(Tr. 1–25 through 1–27.)

### B. A Practical Impediment to Remand

As explained in Part III above, this court has concluded that Travelers improperly delegated its fiduciary duties to MetraHealth when it transferred decisionmaking authority on January 3, 1995. Also, Travelers no longer has employees to process claims. (Tr. at 3–8.) Even MetraHealth's capacity as a purported delegate of Travelers is in doubt because MetraHealth was purchased by United HealthCare Corporation in October 1995. (Aff. of Matthew Friedman at 2.)

Thus, were this court to remand key decisions to an out-of-court decisionmaker, it could not remand either to the entity that was initially designated as the decisionmaker (Travelers) or to the entity (as then constituted) that made the actual decision to deny benefits (MetraHealth).

In the distinctive circumstances of this case, should this court not make a finding of fact but instead make a legal ruling that defendant is accountable to the full extent that the evidence placed before the out-of-court decider by plaintiff, or evidence shown in this trial to be available to be placed before an out-of-court decider on remand, would be sufficient to support identifiable and specified findings for plaintiff?

### C. Jurisdictional Limits on a Court's Functioning as De Novo Finder of Facts

Plaintiff asks this court to perform a function of de novo finder of fact. Jurisdictional limits upon the court's role when its source of jurisdiction is a statutory provision for judicial review are explained in *Recupero*, 118 F.3d 820.

Plaintiff also argues that ERISA's provisions for a private right of action confer this authority on the court. It is true that an exception to limits on jurisdiction exists for independent claims. *See Id.* at 834–36. But the present case is not one in which any of the exceptions listed in *Recupero* applies. Also, plaintiff has not cited, nor is the court aware of precedent supporting any other exception applicable to the circumstances of record in this case.

This case is not like a case brought under the Education of Individuals with Disabilities Act, where a special form of "de novo" review applies. 29 U.S.C. § 727; *See, e.g., Lenn v. Portland School Committee,* 998 F.2d 1083 (1st Cir.1993). Even statutory provisions for that kind of review, moreover, do not authorize unlimited de novo findings of fact and would not enable a court to exercise plenary

jurisdiction to decide on the merits the issues of fact that Travelers, as the plan fiduciary, should have considered and decided, but did not.

## D. Deciding Issues as to Which Plaintiff Has Proffered Evidence Sufficient to Present a Genuine Dispute of Fact

 Because Travelers has disabled itself from now deciding on remand issues of fact and evaluation as to which it should have provided, and did not provide, plaintiff a reasonable opportunity to proffer evidence and argument, no appropriate out-of-court decisionmaker is available to reconsider plaintiff's claim on remand. In these circumstances, I conclude that it is appropriate to impose on Travelers as a consequence of the breach of its fiduciary obligations under the employee benefits plan, a liability for Doe's benefits if Doe has shown a genuine dispute of material fact existing under the evidence that she would have been able to present on remand to an appropriate out-of-court decisionmaker. These genuine disputes of material fact are treated, as a matter of law, as being resolved in plaintiff's favor. In other words, all plaintiff need do in this trial to win an award of benefits in a designated amount is to show that, if allowed a timely and fair hearing or an opportunity to dispute decisions of the fiduciary in an informed way, she could have presented a claim sufficient to permit a discretionary decision in her favor in that amount (rather than more compelling evidence that would have required an unbiased decisionmaker to decide for her in that amount, as a matter of law). I conclude that plaintiff has succeeded in meeting this burden, to the extent of an award of $23,456.04 for the unpaid benefits related to her inpatient hospitalization at HRI.

## VI. Plaintiff's Claim for Daily Statutory Penalty Against Travelers for Nondisclosure

 Doe asks this court to impose a $100 per day penalty for each day that Travelers failed to disclose the Medical Necessity Guidelines used to evaluate Doe's claims. In support of this request, Doe argues that Travelers failed to provide a copy of the Medical Necessity Guidelines (1) at the time of its initial decision, (2) after a letter of request was sent on June 21, 1995, (3) when the time had already run for automatic disclosure in this litigation, and (4) more than 30 days after Doe's May 13, 1996 Request for Production of Documents. Travelers provided the Medical Necessity Guidelines to Doe on August 6, 1996.

In addition to the disclosure provisions discussed in Part II.C above, an enforcement mechanism for disclosure requirements is prescribed in 29 U.S.C. § 1132(c)(1):

> 1) Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title or section 1021(e)(1) of this title with respect to a participant or beneficiary, or (B) *who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day* from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

(emphasis added.)

Travelers indicated in several of its denial letters that it relied upon the Medical Necessity Guidelines in denying Doe's claim. (Ex. 7 and 8.) Travelers does not contend that the failure to provide Doe with the Medical Necessity Guidelines was beyond its control. Instead, Travelers argues that the Medical Necessity Guidelines were not the type of information that ERISA and corresponding federal regulations require to be disclosed.

**640**

More specifically, Travelers argues to this court that:

> To insist on complete disclosure (unsolicited) during the Utilization Review stands the process on its head. The Travelers' Medical Necessity Guidelines were not developed in order to allow individuals like plaintiff to tailor the reports of their clinicians to satisfy the standards or, subsequently, to enable their counsel to develop legal arguments.

(Post-Trial Br. on Behalf of Travelers at 22.)

This argument is rejected. The Court in *Firestone* made clear that "Congress' purpose in enacting the ERISA disclosure provisions [was] ensuring that the individual participant knows exactly where he stands." *Firestone*, 489 U.S. at 103, 109 S.Ct. at 950. Travelers' position is inconsistent with this goal.

I find, on the evidence presented before the court in this trial, that the Medical Necessity Guidelines under which Travelers represented it acted are within the scope of information required to be disclosed under 28 U.S.C. § 1132(c)(1) and pertinent federal regulations.

I find also that Doe's letter of June 21, 1995 was adequate to constitute a request to Travelers to disclose the Medical Necessity Guidelines that Travelers represented it was using. Doe made this request:

> I would appreciate it if you would send me a copy of the medical reviewers report which was the basis for the decision to cover the initial days. I will review it with my physician to see whether there is any chance that we overlooked some rational basis for your decision. I would also welcome a discussion with you regarding the situation if you have any additional information that would persuade me that your decision is reasonable and consistent with my health insurance plan.

(Ex. 18.) This request is adequately framed to communicate Doe's request to Travelers for information about the reasoned basis for denial of her claim, including information from the medical reviewers that Travelers relied upon in making its decisions. The evidence of record discloses that Travelers did not respond to this request for information at all. Rather, Travelers simply sent another letter on August 10, 1995, denying the appeal. Travelers acted at its peril in contending that the request was so vague as to require no response whatsoever.

Travelers' should have disclosed the Medical Necessity Guidelines on or before July 21, 1995, thirty days after Doe sent a written request for information about the basis on which Travelers made its decision to deny coverage. Another 380 days passed before the date the information was disclosed, on August 6, 1996.

Doe has presented evidence adequate to support a finding that she was prejudiced by the delay in providing her with the Medical Necessity Guidelines both by (1) having to borrow money to pay HRI for services rendered and (2) having to pursue litigation in order to vindicate her rights.

For these reasons, this court will, in the exercise of discretion, award $100.00 per day for the full number of days, commencing with July 22, 1995, on which Travelers did not disclose the Medical Necessity Guidelines to Doe.

## VII. Other Terms of the Final Judgment

### A. The Claim for of Declaratory Relief

Plaintiff's request for additional relief in the form of a declaration that the out-of-court decisions of Travelers were arbitrary and capricious has, in effect, been allowed in the determination of the dollar award for benefits. Ordinarily, it is inappropriate for a court to state elements of its legal reasoning in the judgment. In relation to the determination that decisions of Travelers were arbitrary and capricious, I conclude that the usual practice of *not* reciting reasoning in the terms of the judgment is appropriate in this case.

Also, plaintiff's request for an injunction prohibiting Travelers from using its Medical Necessity Guidelines before they are disclosed to *all plan participants* is, in its essence, another request for departure from the usual practice of courts in framing the terms of a judgment. This request is also, in essence, asking for an advisory ruling on a matter not now at issue between plaintiff and

Travelers, in view of the substantive content of the judgment that is being entered in this case. For these reasons, the court will not include injunctive relief in its judgment.

## B. Prejudgment and Post–Judgment Interest

The parties having failed to provide submissions on the basis of which the court could calculate interest precisely, the court locks to and adopts, as a fair measure of compensation for loss of use of funds, the federal post-judgment rate applicable to a judgment entered on March 21, 1996. The court will modify the interest award upon a showing by either party, on or before August 14, 1997, of good cause for doing so.

## C. Attorneys Fees

Plaintiff has included in her submissions a request that this court award attorney fees. The submissions now before the court, however, do not provide a basis for a calculation of a precise fee, or for notice to the opposing party and opportunity to respond. In these circumstances, I do not address the issue regarding attorney fees at this time. See Fed.R.Civ.P. 54(d)(2).

### Conclusion

For the reasons stated in the foregoing Opinion, the Clerk is directed to enter forthwith, on a separate document, a Final Judgment as follows:

(1) Judgment for the plaintiff against Travelers Insurance Company, for benefits due and not paid, in the amount of $23,-456.04, plus prejudgment interest at the rate of 5.25% per annum from March 21, 1996 to the date of this judgment, in the amount of $1678.33, for a total of $25,134.37.

(2) Judgment for plaintiff against Travelers Insurance Company in the amount of $38,000.00 as a statutory award of $100 per day for 380 days under 29 U.S.C. § 1132(c).

Costs are awarded to the plaintiff.

This judgment bears post-judgment interest at the rate of 6.56% per annum.