Elaine CHANDLER, Plaintiff,

v.

RAYTHEON EMPLOYEES DISABIL-
ITY TRUST and Metropolitan Life In-
surance Company, Defendants.

No. Civ.A. 97–11383–PBS.

United States District Court,
D. Massachusetts.

June 11, 1999.

John Wessler, Nathanson, Wessler &
Onerheim, Lawrence, MA, for Plaintiff.

Rita Gylys, Blue Cross/Blue Shield of
Massauchusetts, Boston, MA, Jean M. Kel-
ley, Morrison, Mahoney & Miller, Boston,
MA, for Defendants.

## MEMORANDUM ORDER

SARIS, District Judge.

### INTRODUCTION

This action arises out of a dispute be-
tween plaintiff Elaine Chandler and defen-
dants Raytheon Employees Disability

Trust (the "Trust") and Metropolitan Life Insurance Company ("MetLife") regarding Chandler's eligibility to receive long-term disability benefits. Chandler brings suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), to challenge the defendants' decision that she is not "totally disabled" under the terms of the Raytheon Company Long Term Disability Plan (the "Plan"). The parties have filed cross-motions for summary judgment. After hearing, the plaintiff's motion for summary judgment is **DENIED.** The defendants' motion is **ALLOWED.**

## I. BACKGROUND

The Court treats the following facts as undisputed unless otherwise noted.[1]

### A. The Plan

The Raytheon Company Long Term Disability Plan is an "employee welfare benefit plan" as defined by ERISA. The purpose of the Plan is to provide participating Raytheon employees with long-term disability benefits in the event of full or total disability. The Plan is funded solely through the contributions of participating employees who pay into the Trust. Decisions on all claims for benefits are made by MetLife, the claims administrator. The Plan states:

> The Plan Administrator and, with respect to claims administration, the Claims Administrator, shall have the exclusive right, in their sole discretion, to interpret the Plan and decide all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies, or omissions. All determinations of the Plan Administrator and Claims Administrator with respect to

any matter within their assigned responsibilities hereunder shall be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious.

(R. at 017.) The Plan further states:

> The Claims Administrator is the fiduciary to whom the Plan grants full discretion, with the advice of counsel, to interpret the Plan; to determine whether a claimant is eligible for benefits; to decide the amount, form and timing of benefits; and to resolve any other matter under the Plan which is raised by a claimant or identified by the Claims Administrator. All questions arising from or in connection with the provisions of the Plan and its administration, not herein provided to be determined by the Board of Directors, shall be determined by the Claims Administrator, and any determination so made shall be conclusive and binding upon all persons affected thereby.

(R. at 020.) Participating employees are provided with a summary plan description that summarizes the Plan's benefits.

The Plan has two phases of long-term disability benefits: the "Primary Benefit Period" (first phase) and the "Secondary Benefit Period" (second phase). Under the first phase, an eligible participant is entitled to full disability benefits if he or she "cannot perform the essential elements and substantially all of the duties of his or her job at Raytheon even with a reasonable accommodation." (R. at 004.) Under the second phase, an eligible participant is entitled to total disability benefits if he or she "cannot do the essential elements and substantially all of the duties of his or her job at Raytheon even with reasonable ac-

---

1. At oral argument, plaintiff requested that an article entitled "The Chronic Fatigue Syndrome: A Comprehensive Approach to Its Definition and Study" be included as part of the record for review before this Court. Because this evidence was not before MetLife at the time of its decision to terminate Chan-

dler's benefits, this evidence will not be considered now. *See Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991) ("[W]hen reviewing a denial of benefits under ERISA, a court may consider only the evidence available to the administrator at the time the final decision was made.")

commodations; and cannot do any other job for which he or she is fit by education, training or experience." (R. at 006.) An employee may receive full disability benefits for the first two years of disability, at the end of which payments terminate unless the employee qualifies for total disability benefits.

### B. *Primary Benefit Period*

Elaine Chandler, currently sixty years old, was employed at the Raytheon Corporation's Lowell facility from 1974 until April 12, 1993. While at Raytheon, Chandler worked in various jobs, the last of which was a missile test operator. Chandler has a high school education, with additional training as a dental assistant. In May of 1993, Chandler submitted a claim for long-term disability benefits, asserting that she suffered from acute back pain and an arthritic condition. On May 27, 1993, at the direction of MetLife, Chandler obtained an independent medical exam ("IME") from Dr. Philip Salib, an orthopedic surgeon. Dr. Salib determined that the pain in Chandler's lower back and right knee were essentially due to osteoarthritic changes in both regions without nerve root irritation or a disc problem. He also determined that Chandler suffered from extreme obesity. Dr. Salib concluded that Chandler could do any kind of light work that did not require repeated bending over or lifting more than twenty pounds at a time. He told Chandler to avoid long periods of walking and stairs. Because Raytheon could not reasonably accommodate these restrictions, MetLife determined that Chandler was fully disabled and therefore entitled to long-term disability benefits in accordance with the Plan's first phase. Payments to Chandler commenced on July 22, 1993.

On December 14, 1993, at the direction of MetLife, a second IME was conducted by Dr. James F. Kiely, an orthopedic surgeon. After the exam and a review of Chandler's medical information, Dr. Kiely found that Chandler could do light duty if it allowed for frequent changes in position with a minimum of walking and standing. Dr. Kiely concluded that Chandler was not able to lift anything over fifteen pounds and could not climb stairs or do any bending. Because Chandler still could not perform her job at Raytheon, even with reasonable accommodations, her long-term disability benefits continued.

### C. *Secondary Benefit Period*

In order for benefits to continue after July 21, 1995, Chandler was required to show that she was "totally disabled" and that she could not do any job for which she was fit by education, training, or experience. On July 13, 1995, just before this more stringent definition was triggered, Chandler was once again examined by Dr. Salib at the direction of MetLife. For this examination, MetLife provided Dr. Salib with Chandler's medical information, a summary of her education, training, and experience, and a description of Chandler's job. After reviewing her records and conducting the examination, Dr. Salib concluded that Chandler could "do any kind of work that does not require lifting more than 30 pounds at a time or repeated bending over," could "sit, stand or walk within short distances while at work," and had "been able to drive distances that corresponded with those between her residence and work." (R. at 244.)

MetLife then referred Chandler's claim file to a vocational assessor for a determination whether Chandler had transferrable skills that would qualify her for other occupations based on her education, training, experience, and residual functional abilities. For this assessment, the vocational assessor was provided with Chandler's medical information, work history, and education. In a report dated August 16, 1995, the assessor concluded that Chandler had good transferable skills for sedentary and light duty occupations. These occupations included a dealer-compliance representative, a rater, a personnel quality assurance auditor, and a sales agent. These

occupations were all commensurate with Chandler's previous salary.

On August 17, 1995, based on the conclusions of Dr. Salib and the vocational assessor, MetLife determined that Chandler did not satisfy the Plan's definition of total disability, and terminated her claim for long-term disability benefits effective July 22, 1995. Chandler received instructions at that time on how to request a review of her claim.

### D. *Review of Chandler's Claim*

On September 11, 1995, Chandler requested MetLife to reconsider its denial of long-term disability benefits. At the invitation of MetLife, Chandler produced additional medical information to substantiate her disability. Chandler submitted a letter dated October 16, 1995, from Dr. Manoucher S. Shirazi, Chandler's orthopedist, who opined that, due to the combination of the arthritic condition of her back and right knee and her obesity, she was totally disabled and would permanently remain totally disabled. Dr. Shirazi further stated that Chandler was not able to tolerate prolonged sitting, walking, or standing and that she could not bend her back and lift objects from the floor.

Chandler also provided a letter dated October 30, 1995, from Dr. Roberta H. Guy, Chandler's internist. Dr. Guy listed Chandler's medical problems as follows: moribund obesity, hypertension, irritable bowel syndrome, spinal stenosis, depression, fibromyalgia, and menopausal syndrome. Dr. Guy concluded that, due to Chandler's multiple medical problems, the possibilities of her employment were negligible. Dr. Guy diagnosed Chandler's condition as totally disabling.

Additionally, Chandler submitted a letter dated December 13, 1995, from Dr. Tina J. Horwitz, Chandler's rheumatologist, who had been treating her since 1991 for fibromyalgia and osteoarthritis. Dr. Horwitz stated that, prior to July 22, 1995, Chandler had been doing fairly well but had then experienced a flare of her two conditions. With medication, she did fairly well again until October 1995, at which time she reported she clinically worsened. Chandler described her activities to Dr. Horwitz as going from bed to chair to weight bearing and said that she was only able spend short amounts of time in each of these positions before the pain increased significantly. Chandler also told Dr. Horwitz that she had pain in her hands, shoulders, back, knees, and ankles at various times. Dr. Horwitz concluded that, because of these patterns of pain, Chandler would find it exceedingly difficult to work even a sedentary job. Chandler also included for MetLife's review numerous physical therapy records dated April 26, 1993, through June 8, 1995.

MetLife referred all of Chandler's records for an outside medical evaluation to National Medical Review ("NMR"), a medical record review company. Chandler's file was reviewed by Dr. Robert D. Petrie, a board-certified specialist in occupational medicine. After an extensive review of Chandler's file, Dr. Petrie issued a report dated January 10, 1996, concluding that there was "insufficient documentation in the file to support a claim of total disability from any and all occupations for which the claimant is reasonably suited, based on education, training and experience, due to the diagnoses of *moribund obesity,* spinal stenosis, or fibromyalgia." (R. At 393 (emphasis added).)

On January 31, 1996, based on the additional medical information provide by Chandler, Dr. Petrie's file review, and the previous information contained in Chandler's file, MetLife upheld its previous termination of long-term disability benefits and determined that Chandler was not totally disabled under the Plan.

On May 1, 1996, Chandler, represented by counsel, again formally requested that MetLife review its decision to terminate long-term disability benefits effective July 22, 1995. To further support her claim, Chandler's counsel submitted a second let-

ter from Dr. Horwitz dated May 13, 1996. Dr. Horwitz again stated that Chandler continued to suffer from osteoarthritis and fibromyalgia, which had worsened due to her significant obesity and due to stress caused by family problems. Dr. Horwitz could not provide an exact date for the onset of Chandler's medical disability, but she stated that Chandler was doing satisfactorily in April 1995 but was experiencing difficulties at her next appointment in October 1995.

Chandler's counsel also submitted additional notes from Dr. Shirazi dated May 8, 1995, and July 19, 1995. Dr. Shirazi described Chandler's aqua therapy routine and stated that Chandler's condition had reached a plateau and that she would have some discomfort in her back on a permanent basis due to her arthritic condition and degenerative condition of her lumbar spine. Dr. Shirazi concluded that, at that time, no specific treatment was necessary except for weight loss and continuation with an exercise program.

On September 5, 1996, Chandler's counsel submitted additional medical information. A letter from Dr. Shirazi dated July 29, 1996, concluded that Chandler was totally and permanently disabled due to multiple conditions—specifically, arthritic involvement of the cervical and lumbar spine, arthritic involvement of her right knee, and her obesity. A letter from Chandler's physical therapist dated August 9, 1996, described Chandler's pool therapy. Records from the Social Security Administration ("SSA") regarding Chandler's claim for disability benefits established that on January 20, 1994, the SSA had favorably decided that Chandler had satisfied the medical requirements of Listing 10.10(A) (Obesity) and that Chandler was entitled to benefits as of April 13, 1993. In addition to obesity, Listing 10.10(A) required Chandler to establish a "[h]istory of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with X-ray evidence of arthritis in a weight bearing joint or spine." (R. at 445.)

MetLife referred these additional records to NMR for a further review by Dr. Petrie. In a letter dated October 1, 1996, Dr. Petrie concluded:

Ms. Chandler has subjective pain complaints, but without evidence of specific neuromuscular impairments which would prevent her from performing sedentary job activities. She is capable of performing aqua exercises. Her condition as of mid 1995, was reported by the attending rheumatologist as well as the independent medical examiner as being satisfactory, and she was not felt to be disabled. Based on the frequency of office visits and the records provided which cover this time frame, there is no indication that there has been a significant change in her condition.

(R. at 457.)

On November 5, 1996, MetLife once again requested from Chandler's counsel the submission of any additional facts or medical evidence to support Chandler's claim. In response to this request, Chandler's counsel submitted a chest scan dated May 2, 1995, and an x-ray taken on April 15, 1996. In addition, letters from Chandler's physical therapists, Bruce Hutchinson and Sharon Cullen, were submitted to clarify statements in Chandler's record. Hutchinson and Cullen both explained that Chandler could never swim six laps consecutively. Hutchinson explained that Chandler had no complaints of back pain after a three-hour trip because of frequent stops and that Chandler was only able to garden for fifteen to twenty minutes with physical pain and difficulty. Cullen further stated that Chandler could not tolerate constrained postures for more than fifteen to twenty minutes. A letter from Dr. Guy dated November 1, 1996, stated that she was presently treating Chandler for severe low back pain and right knee pain secondary to degenerative osteoarthritis, moribund obesity, and fibromyalgia. It was

Dr. Guy's opinion that Chandler was totally disabled due to her multiple medical problems. Also included was an affidavit from Chandler dated November 11, 1996. The affidavit, which explained her pool therapy, stated that she could not swim six laps consecutively and that on the days she did participate in pool therapy she could not do anything else because the therapy left her exhausted. Chandler also explained her gardening activity, stating that she had to give up most of it due to her health and that the gardening she was able to perform left her hurt and tired. Finally, Chandler clarified for the record a trip she had taken for a family wedding from Lowell, Massachusetts, to Conway, New Hampshire. Chandler stated that her daughter had driven and that the trip had taken an extra hour to allow her to rest and stretch.

MetLife once again submitted this additional information to NMR for Dr. Petrie's review. In a letter dated January 24, 1997, Dr. Petrie concluded that Chandler does have a chronic pain syndrome consistent with fibromyalgia. However, Dr. Petrie stated that "there is little evidence of specific neuromuscular disorder resulting in loss of strength or mobility which would prevent sedentary activities including gainful employment." (R. at 496.) Dr. Petrie noted that, although Chandler does suffer from extreme obesity, which may prevent the performance of certain activities, obesity would typically not prevent sedentary work. Dr. Petrie concluded that, if Chandler were "totally inactive, home bound and had to rely upon others to perform all activities such as shopping, cleaning, gardening and driving, then [he] would have to agree that she was in fact totally disabled." (R. at 497.)

On March 11, 1997, MetLife hired an investigator to conduct a video surveillance of Chandler. Chandler was observed entering and exiting her vehicle, cleaning snow off of her car, driving, attending a doctor's appointment, shopping at two separate stores, and carrying a package into her residence. Chandler was also observed walking with a noticeable limp and with the assistance of a cane. On the basis of this additional information, in a letter dated April 14, 1997, MetLife determined that the termination of disability benefits as of July 22, 1995, had been proper. On May 27, 1999, Chandler filed this action in state court alleging a violation of ERISA. Defendants properly removed it here pursuant to 28 U.S.C. § 1441.

## II.  DISCUSSION

### A.  ERISA Standard of Review

Chandler claims that MetLife's decision to terminate her long-term disability benefits was arbitrary and capricious and a breach of MetLife's fiduciary duty in violation of ERISA. A participant of an ERISA-governed plan can bring an action "to recover benefits due" to her under the terms of her plan, to enforce her rights under the terms of the plan, or to clarify her rights to future benefits under the terms of the plan. ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). A district court reviews ERISA claims arising under 29 U.S.C. § 1132(a)(1)(B) de novo unless the benefits plan in question confers upon the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 583 (1st Cir. 1993) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). If the plan clearly gives such discretionary authority, then the administrator's decisions are subject to "a deferential 'arbitrary and capricious' standard of judicial review." *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir.1997) (citing *Firestone*, 489 U.S. at 115, 109 S.Ct. 948). Under this standard, a decision to deny benefits to a beneficiary will be upheld if it was "reasoned and supported by substantial evidence in the record," evidence that is "reasonably sufficient to support a conclu-

sion." *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.1998).

Chandler argues that a *de novo* standard of review applies in this case because MetLife improperly delegated its fiduciary obligation to Dr. Petrie in determining Chandler's eligibility for benefits under the Plan. "When the decision to deny benefits is made by a person other than the named fiduciary, or someone who has been given discretionary authority to make plan coverage decisions, a court must review any such decision de novo." *Doe v. Travelers Ins. Co.,* 971 F.Supp. 623, 635 (D.Mass. 1997), *aff'd in part and rev'd in part,* 167 F.3d 53 (1st Cir.1999). Chandler alleges that MetLife, instead of undertaking an independent analysis of her claims, regurgitated Dr. Petrie's conclusions without any effort to exercise its own independent judgment. To support this contention, Chandler points to the fact that MetLife used some of Dr. Petrie's statements verbatim in its denial letter of April 14, 1997.

Plaintiff's reliance on *Doe* is misplaced for two reasons. First, the First Circuit declined to address the delegation analysis but instead determined that the denial of benefits was improper even using reasonableness as its touchstone for review. Second, the record does not support impermissible delegation of authority here even with a *Doe* analysis. Although MetLife admits quoting certain portions of Dr. Petrie's statements, its denial letter cites all of the medical records, the vocational assessment report, Dr. Petrie's reports, and the surveillance video in deciding to terminate Chandler's benefits. Significantly, MetLife conducted independent surveillance to determine the extent of disability and did not rubberstamp Dr. Petrie's report. Because MetLife exercised discretionary authority to administer the Plan, this Court finds the deferential standard of review to be appropriate. In reviewing MetLife's decision to terminate Chandler's benefits, the question before this Court is thus whether MetLife had "substantial evi-dentiary grounds for a reasonable decision in its favor." *Doyle,* 144 F.3d at 184.

### B. *MetLife's Termination of Long–Term Disability Benefits*

■ In her well-written memorandum of law, Chandler argues that MetLife's decision to terminate long-term disability benefits was arbitrary and capricious because MetLife failed to consider the combined effect that Chandler's arthritis, fibromyalgia, and obesity had on her ability to work at any job. Specifically, Chandler states that MetLife did not consider her obesity on the first two record reviews and was unreasonable in considering obesity on the third record review. The record does not support this argument. Both examining physicians, Dr. Salib and Dr. Kiely, made specific reference to Chandler's obesity in their assessments. In his May 27, 1993, exam of Chandler, Dr. Salib stated: "She is 5′9″ and weighs 310 lbs. She presents no acute distress but walks with difficulty, due to the overweight which is essentially in the lower half of the body." (R. at 091.) Noting Chandler's "[e]xtreme obesity," (R. at 093), he concluded: "There is no question that both the overweight and the longstanding degenerative changes contribute to her symptoms," (R. at 093). In his July 13, 1995, exam, Dr. Salib highlighted again his impression of "[e]xtreme obesity" and determined that "[w]eight loss comes as # 1 in the treatment." (R. at 244.) He concluded: "From the orthopedic viewpoint, she is able to do any kind of work that does not require lifting more than 30 pounds at a time or repeated bending over." (R. at 244.) In Dr. Kiely's December 14, 1993, exam of Chandler, he remarked that "the patient is seen to be a pleasant lady who stands 5′9″ and weighs approximately 300 lbs," and that "[h]er obesity prevents further evaluation." (R. at 147.) Dr. Petrie had all of the medical reports for consideration, and the vocational assessor reviewed Dr. Salib's July 13, 1995, report, as well as the reports of the treating physician. MetLife had the surveillance videotape of March 11, 1997,

which reflected Chandler's obesity. In addition, the medical reports provided to MetLife by Chandler's treating doctors reference the role of her obesity. Based on the above evidence, MetLife fully considered Chandler's obesity together with her other medical impairments, including subjective pain complaints, in its decision to deny long-term disability benefits.

■ Chandler also suggests that MetLife should have given more weight to the SSA's disability determination. Conceding that the requirements for determining disability are different as between the Plan and the SSA, Chandler argues that the SSA correctly analyzed that it is her obesity in conjunction with her medical impairments that is responsible for her disability. Although it is appropriate for a court to consider the SSA's decision that a claimant was or was not disabled, *see Kiley v. Travelers Indemnity Co.,* 853 F.Supp. 6, 13 (D.Mass.1994), decisions concerning social security disability benefits are not dispositive in determinations of eligibility for long-term disability benefits under a private plan, *see Doyle,* 144 F.3d at 186 n. 4 (holding that the SSA's award of benefits based on the same information before the plan administrator had no binding effect). MetLife's decision was based on the Plan requirement that Chandler could not do any job for which she was fit by education, training, or experience, whereas the SSA required that Chandler meet the presumptive weight requirement of Listing 10.10(A) along with a medical condition.

The fact that contrary medical assessments by Chandler's treating physicians exist does not change this analysis. *See id.* at 184 ("Sufficiency, of course, does not disappear merely by reason of contradictory evidence."). Here, Chandler has not shown that MetLife acted unreasonably in relying on the medical assessments of Dr. Salib, the medical review by Dr. Petrie, the vocational assessor's report, and the video in determining that Chandler was able to perform a job for which she was fit by education, training, or experience on July 22, 1995.

### ORDER

For the foregoing reasons, Chandler's motion for summary judgment (Docket No. 20) is **DENIED,** and MetLife's motion for summary judgment (Docket No. 15) is **ALLOWED.**