Gail **KRAUSE**,

v.

**MODERN GROUP, LTD., and Subsidiaries Employee Welfare Benefit Plan, and Modern Group, Ltd., and Allianz Life Insurance Company of North America, Inc., and North American Benefits Company, Inc., and Claims Service International, Inc.**

No. CIV.A. 00–534.

United States District Court,
E.D. Pennsylvania.

Dec. 19, 2000.

---

S. Richard Klinges, III, Karen Saraco Burns, Begley, Carlin & Mandio, Langhorne, PA, for Gail Krause.

Anthony J. Watkins, Bradford M. Brush, Schnader, Harrison, Segal & Lewis, LLP, Philadelphia, PA, Matthew Miner, Dechert, Price & Rhoads, Philadelphia, PA, for Defendants.

### MEMORANDUM

LUDWIG, District Judge.

Defendants Allianz Life Insurance Company of North America, Inc., North American Benefits Company, Inc. (NABCO), and Claims Service International, Inc. (CSI) move for summary judgment. Fed. R.Civ.P. 56.[1] Jurisdiction is federal question. 28 U.S.C. § 1331.

In this ERISA action, 29 U.S.C. § 1001 et seq, plaintiff Gail Krause challenges defendants' denial of her claim for long-term disability benefits.[2]

### I. Background

On December 4, 1967, plaintiff was hired by Modern Group, where she worked as a secretary until December 17, 1997, when she was age 50. Cmplt. ¶ 19. As an employee, she was covered under a health and disability insurance policy issued to Modern Group by Allianz. Id. ¶ 15. The cover sheet of the policy designated NABCO as benefits payment administrator, id. exh. A, and NABCO, in turn, retained CSI to review employee medical records and assess claims. Cmplt. ¶ 16; defs.' mem. exh. A (Joe Practico aff. ¶ 3); defs.' supp. mem. exh. A (Alan Hill aff. ¶ 6).

According to the complaint, as of December 18, 1997, plaintiff's medical condition consisted of: "diffuse white matter lesions,[3] consistent with small vessel cerebrovascular disease[4] with gait instability/disequilibrium due to brain stem or cerebral involvement; vertigo;[5] ataxia;[6] multiple sclerosis/demyelinating disorder[7] suspect; severe vertigo; extensive white matter ischemic disease;[8] hypertension;[9]

---

1. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must show that there is no triable issue. The nonmovant having the burden of proof at trial must point to affirmative evidence in the record—and not simply rely on allegations or denials in the pleading—in order to defeat a properly supported motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Pi Lambda Phi Fraternity v. University of Pittsburgh,* 229 F.3d 435, 441 n. 3 (3d Cir.2000).

2. By agreement, defendants Modern Group, Ltd. and Subsidiaries Employee Welfare Benefit Plan and Modern Group, Ltd. were dismissed, Order, May 18, 2000.

3. White matter: brain tissue composed of myelin-coated nerve cell fibers. White matter carries information between the nerve cells in the brain and the spinal cord. Lesion: any pathological or traumatic discontinuity of tissue or loss of function or part. Medical Dictionary, at http://www.medical-dictionary.com (last visited December 13, 2000).

4. Cerbrovascular: pertaining to the blood vessels of the cerebrum or brain. Medical Dictionary, at note 3 *supra.*

5. Vertigo: an illusion of movement, a sensation as if the external world were revolving around the patient (objective vertigo) or as if he himself were revolving in space (subjective vertigo). The term is sometimes erroneously used to mean any form of dizziness. Medical Dictionary, at note 3 *supra.*

6. Ataxia: failure of muscle coordination, irregularity of muscle action. Medical Dictionary, at note 3 *supra.*

7. Demyelination: degenerative process that erodes away the myelin sheath that normally protects nerve fibers. Demyeliniation exposes these fibers and appears to cause problems in nerve impulse conduction that may affect many physical systems. Demyeliniation is seen in a number of diseases, particularly multiple sclerosis. Medical Dictionary, at note 3 *supra.*

8. Ischemea: a low oxygen state usually do to the obstruction of the arterial blood supply or inadequate blood flow leading to hypoxia in

severe vertigo peripheral in origin; unsteady gait which is wide based and spastic; [and] other injuries, which are permanent." Cmplt. ¶ 19. As a result, she is alleged to have been unable to work.

On March 9, 1998, plaintiff submitted a claim for long-term disability benefits to Allianz under its policy, which states:[10]

Section IV Benefits

* * *

*Proof of Disability*

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

1. Disability; and

2. Regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

* * *

Section VI—General Policy Provisions

* * *

F. *Notice and Proof of Claim* . . .

2. Proof

a. Proof of claim must be given to the Company. This must be done no later than 90 days after the end of the elimination period. . . .

c. Proof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for proof.

* * *

G. *Time of Payment of Claims*

When the Company receives satisfactory proof of claim, benefits payable under this policy will be paid monthly during any period for which the Company is liable. Any balance remaining unpaid upon the termination of the period of liability will be paid immediately upon the receipt of due written proof.

Defs.' mem. exh. B.[11]

By letter dated May 8, 1998, CSI acknowledged receipt of plaintiff's claim and requested additional information. D1, D2.[12] On June 3, 1998, her treating family physician, Thomas Schultz, M.D., submitted to CSI a "Functional Capacity Form." It stated that plaintiff suffered from "dise-

the tissue. Medical Dictionary, at note 3 *supra.*

**9.** Hypertension: persistently high arterial blood pressure. Hypertension may have no known cause (essential or idiopathic hypertension) or be associated with other primary diseases (secondary hypertension). This condition is considered a risk factor for the development of heart disease, peripheral vascular disease, stroke, and kidney disease. Medical Dictionary, at note 3 *supra.*

**10.** The policy appended to the complaint varies slightly but non-materially from that proffered by defendants. Defendants' version will be used because both parties' briefs quote from it.

**11.** The policy defines the "Company" as Allianz Life Insurance; and "total disability" as being "unable to perform all the material and substantial duties of his occupation on a full time basis because of disability: a) caused by injury or sickness; b) that started while insured under this policy." Defs.' mem. exh. B.

**12.** The pertinent facts are set forth in the record before CSI, note 23 *infra,* which is appended to defendants' motion (it will be cited here as labeled—from D1 to D56). Defs.' mem. exh. D. Plaintiff does not dispute that the appended material constitutes CSI's entire record.

quilibrium/gait disturbance and small vessel CVS disease vs. MS," which rendered her "100%" disabled. D3. Dr. Schultz also gave CSI his office notes dated December 11, 1997, Feburary 24 and June 4, 1998. D4–D6.

The claim record included a letter from Emil Matarese, M.D. to Dr. Schultz, dated December 30, 1997, stating that plaintiff's "presentation is most consistent with small vessel cerebrovascular disease.... " D50. Additionally, "in view of her young age, we are obligated to fully exclude all predisposing factors that could place her at risk for progression in her disease and strokes in the future." *Id.*[13] By letter dated June 29, 1998, following a mandatory 90–day waiting period, CSI approved the claim, effective from March 18, 1998. D7.

After the approval, CSI's disabilities benefits specialist, Keith Lambert, followed plaintiff's progress and further inquired of other treating physicians as to her medical condition. Defs.' mem. exh A

(Joe Practico aff. ¶¶ 6–7). Dr. Schultz's office note, dated February 24, 1998, stated that plaintiff had been examined by Scott Kasner, M.D., a neurologist at the Hospital of the University of Pennsylvania (HUP). D5. By letter dated June 29, 1998, CSI requested that Dr. Kasner send copies of his office notes and complete a functional capacity evaluation form. D8.

On June 30, 1998, Dr. Kasner completed the form, opining that plaintiff had capacity to do light work. D9. He also sent a copy of his letter to Dr. Matarese, dated February 11, 1998, in which he noted that plaintiff had complained of vertigo for eight to 10 years, had fallen on numerous occasions, at home and work, and had experienced other medical problems in the past.[14] D14. He suggested that the evaluation in 1994 was unworkable, which "warrant[ed] re-investigation and perhaps an empirical trial of therapy for possible Meniere's disease."[15] D15. He concluded

---

**13.** Results from two MRI tests, taken on December 4, 1997 and August 31, 1994, are shown in letters addressed to Dr. Matarese. D46–D48. In the letter dated September 1, 1994, Leonard Gordon, M.D., wrote that the "images suggest microvascular disease...." D48. The December 5, 1997 letter provides: "[t]here has been no appreciable change since the previous MRI of 08/31/94." D46.

**14.** The letter concluded that plaintiff suffered from "two distinct clinical entities":

First, she has severe vertigo which seems to be peripheral in nature. Her symptoms are profoundly positional and her pattern of nystagmus is entirely consistent with peripheral disease. There is no evidence of significant brainstem or cerebellar abnormality on exam or on the MRI.

In addition, she has extensive periventricular white matter disease. Given her history of hypertension and smoking, as well as the MRI appearance of the white matter abnormality, I think this is most consistent with small vessel ischemic cerebrovascular disease. However, I cannot rule out the possi-

bility of prior demylination. There have been no clinical events since the optic neuritis 18 years ago. I do not think this warrants further evaluation for demyelination at this point. For the small vessel disease, I agree with the treatment regiment with asprin. I also stressed the importance of smoking cessation.

I think the next diagnostic step should be further ENT evaluation. Her evaluation in 1994 was unrevealing. Nevertheless, I think this warrants re-investigation and perhaps an empirical trial of therapy for possible Meniere's disease. I will see Ms. Krause back on an as-needed basis. If further evaluation of her peripheral vertigo is required, I would suggest a referral to Dr. David Solomon of neuro-otology at HUP.
D15.

**15.** Meniere's disease: a name applied to recurrent vertigo accompanied by ringing in the ears (tinnitus) and deafness.... Symptoms include dizziness, hearing loss (one-sided), vertigo, nausea, vomiting and abnormal eye movements. Tinnitus: a noise in the ears, as ringing, buzsing [sic], roaring, clicking, etc.

by recommending a referral to David Solomon, M.D., a neuro-otologist at HUP. *Id.*

In a memorandum to Lambert, dated July 24, 1998, CSI's physician, P.J. Mascetta, D.O., pointed out the discrepancy between the opinions of Doctors Schultz and Kasner and concluded that "the information [in the file] would indicate the clmt has sedentary/light work capacity." D35. On August 12, 1998, Barry Gendron, D.O., another CSI physician, wrote to Lambert, recounting his discussion with Dr. Schultz regarding the disparity between the doctors' opinions. D36. According to Gendron, Dr. Schultz expressed concern "for Ms. Krause's safety in the work environment in that she needed to walk to retrieve files, etc., and apparently, he is concerned with her safety due to her poor balance." *Id.* Gendron said that he would contact Dr. Solomon to "reconcile the discrepancy between Dr. Schultz' and Dr. Kasner's viewpoints on occupational functional capacity." *Id.*

By letter dated October 12, 1998, CSI requested that Dr. Solomon submit his office notes and reports. In response, Dr. Solomon sent in his letter to Dr. Schultz, dated July 21, 1998, which stated that plaintiff was in good general heath, and that she had "a history and previous examination consistent with peripheral positional vertigo." D18–D21. It also said that some of his findings were consistent with white matter changes noted on the MRI, and "the history of optic neuritis makes demyelinating disease a possible etiology, although the brain findings were not typical of this." *Id.* Dr. Solomon recommended a follow-up in six months, and asked plaintiff to contact him so she could be re-examined during one of her spells of vertigo. *Id.*

On January 22, 1999, Dr. Gendron wrote Dr. Solomon to summarize their conversation earlier in the day. According to the letter, Dr. Solomon had told Dr. Gendron that plaintiff suffered from "positional vertigo," and he was concerned about the possibility of Meniere's syndrome. D40–D41. As to plaintiff's ability to work, his opinion was that "if she has Meniere's syndrome, then she 'can't work through an attack.' If she has BV, then she should respond to vestibular rehabilitation interventions." D40–41. On the same day, Dr. Gendron also wrote a memorandum to Lambert in which he acknowledged that plaintiff's functional capacity was unclear. D39. However, he stated that the file contained no evidence that plaintiff was "completely impaired from her own occupation." *Id.* He believed that Lambert should encourage plaintiff to see Dr. Solomon again, *id.*, but it does not appear in the claim record that Dr. Solomon re-evaluated plaintiff.

On March 18, 1999, Lambert wrote to Dr. Schultz, requesting that he reconsider plaintiff's ability to return to work in a sedentary to light work occupation. D23.[16]

Such sounds may at times be heard by others than the patient. Medical Dictionary, at note 3 *supra.*

**16.** The letter stated:

This letter is in follow up to a prior phone conversation you had with Barry C. Gendron, D.O. from our On Site Medical Team on August 7, 1998.

During that conversation, it was felt that Gail's restrictions included avoiding walking in the work place (not sure how many hours a day), short distance driving, no climbing stars, or carrying heavy objects.

On January 22, 1999, Dr. Gendron spoke with David Solomon, MD, Ph.D. regarding his July 21, 1998 evaluation of Ms. Krause. Dr. Solomon was unclear of Ms. Krause's primary disability and work capacity. Dr. Solomon felt additional testing would be beneficial in determining Ms. Krause's future treatment plans. However, based on a con-

On March 31, 1999, Dr. Schultz responded that he had reviewed the reports of Doctors Solomon and Kasner, and, given plaintiff's job description, he concluded that she seemed "capable of performing duties in a sedentary to light work capacity." Defs.' mem. exh. D25. By letter dated April 5, 1999, CSI informed plaintiff that, based on the evaluations of Doctors Schultz, Kasner and Solomon, she was no longer entitled to benefits. Cmplt. ¶ 24, exh. C.[17] On April 20, 1999, plaintiff requested a review of the denial. On June 15, 1999, CSI upheld its decision. Cmplt. exh. F. On January 28, 2000, plaintiff filed this ERISA action for "benefits due ... under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).[18]

## II. Standard of Review

■ Under ERISA, the standard of review is de novo unless the plan gives the administrator or fiduciary discretionary authority to determine the employee's eligibility or construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). A plan's grant of discretion may be either express or implied, and need not constitute a "clear and unequivocal statement of discretion." *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1256 (3d Cir.1993); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir.1991) ("Discretionary power may be implied by a plan's terms even if not granted expressly."). Conceding that there is no language in the plan granting the administrator discretion, defendants maintain that the policy's requirement of "satisfactory proof of claim" accorded NABCO, as administrator, discretion to determine plaintiff's eligibility. Defs.' supp. mem. at 4.

■ In recently considering a policy that provided benefits for individuals who submitted "satisfactory proof" of "Total Disability," our Court of Appeals stated it "is undisputed that Reliance Standard had discretion to interpret the plan." *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 379 (3d Cir.2000).[19] Other decisions within

---

versation I had with Gail on March 17, 1999, she has not and is unaware if she will be sent for this testing.

Therefore, we have to assume her condition has improved to the point that additional testing isn't necessary. In addition, we can not understand why her functional capacity would be any different that the sedentary to light work capacity Dr. Kasner felt she had back in 6/98....

Please inform us if you disagree with Dr. Kasner's opinion of Ms. Krause having a sedentary to light work capacity. In addition, please review Ms. Krause's job description and inform us why she cannot return to work in her own occupation as a secretary and provide information to support your opinion. D23.

**17.** The letter stated:

In following up to our conversation, I forwarded a letter to Thomas L. Schultz, M.D. outlining your prior treatments with Scott Kasner, MD, David Solomon, M.D., PhD, and himself. In addition, we forwarded a copy of your job description and asked why you could not return to work in your own occupation as a Secretary at this time.

On March 31, 1999, Thomas Shultz, M.D. informed us you are capable of performing duties in a sedentary to light work capacity. Dr. Schultz also felt your job description provided by your employer falls within your work capacity.

Based on the above information, we do not feel you are eligible for any further Long Term Disability benefits beyond 3/18/99 and have closed your claim. D23.

**18.** On December 7, 2000, at oral argument, plaintiff's counsel stated that plaintiff would not pursue her Pennsylvania bad faith claim.

**19.** Although not precedential, an earlier unpublished opinion in the same case held that a policy requiring submission of "satisfactory proof of Total Disability to us" vested discre-

our district have found discretion to have been implied by identical or nearly identical language. *See Friess v. Reliance Std. Life Ins. Co.,* 122 F.Supp.2d 566, 575 (E.D.Pa.2000); *Kutner v. UNUM Life Ins. Co. Of America,* No. CIV.A. 99–800, 2000 WL 295104, at *3 (E.D.Pa. Mar. 20, 2000) ("proof"); *Marques v. Reliance Std. Life Ins. Co.,* No. CIV.A. 99–2033, 1999 WL 1017475, at *2 (E.D.Pa. Nov. 1, 1999) ("satisfactory proof"); *Landau v. Reliance Standard Life Ins. Co.,* No. Civ.A. 98–903, 1999 WL 46585, at *2 (E.D.Pa. Jan. 13, 1999) ("satisfactory proof of total disability"); *Sciarra v. Reliance Standard Life Ins. Co.,* No. CIV.A. 97–1363, 1998 WL 564481, at *7 (E.D.Pa. Aug 26, 1998); *but see Starita v. NYLCare Health Plans, Inc.,* No. CIV.A. 98–5373, 2000 WL 330038, at *6 (E.D.Pa. Mar. 29, 2000) ("proof of total disability" did not confer discretion). Here, consistent with the great weight of caselaw in our Circuit, the Allianz policy is held to have conferred implied discretion on the plan administrator.[20]

■ Nevertheless, under *Firestone,* "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956–57 (quoting Restatement Second of Trusts § 187 cmt. d (1959)). In implementing this dictate, our Court of Appeals, also in *Pinto,* decided that a heightened form of arbitrary and capricious review applies to an entity that both pays benefits and acts as administrator. *Pinto,* 214 F.3d at 378. *Pinto* recognized that certain types of financial structures would ameliorate the conflict of interest. *Id.* at 383. For example, a more stringent standard of review should not be used where an employer, acting as administrator, "incurs no direct expense as a result of the allowance of benefits, nor ... benefit[s] directly from the denial or discontinuation of benefits." *Id.* at 383, 386 (quoting *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 n. 5 (3d Cir.1993)).

■ Here, a heightened standard of review is not warranted.[21] Plaintiff contends that the relationships involved should raise a suspicion of self-dealing on the part of Allianz. Pltf.'s mem. at 13. According to plaintiff, because she sent her claims to Allianz and Allianz controlled the right to conduct medical examinations of claimants, Allianz, and not NABCO, was the real administrator. *Id.* at 4. However, the cover of the policy designated NABCO as "Plan Administrator." Cmplt. exh. A; *see* 29 U.S.C. § 1002(16)(A)(i)–(ii) ("the admin-

tion in the administrator to determine benefits eligibility. *Pinto v. Reliance Std. Life Ins. Co.,* No. 97–5297, slip op. at 7, 1998 WL 334448 (3d Cir. May 28, 1998).

**20.** Other Courts of Appeal are divided over the issue. *Compare Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 2000 WL 202653 (7th Cir. Feb. 23, 2000) (no discretion where plan requires administrator to pay benefits upon receipt of "satisfactory written proof"); *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 252 (2d Cir.1999) ("satisfactory proof ... is an inadequate way to convey the idea that a plan administrator has discretion"); *Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999) (de novo review

appropriate because "satisfactory written proof" is ambiguous), *with Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555–58 (6th Cir.1998) (provision granting insurance company with "right to require as part of the proof of claim satisfactory evidence" vested discretion); *O'Bryhim v. Reliance Std. Life Ins. Co.,* 188 F.3d 502, 1999 WL 617891 (4th Cir. Aug. 16, 1999) (unpublished disposition) (same).

**21.** In *Pinto,* the Court of Appeals noted that structural variations among "the ERISA plan administration, interpretation, and funding" "might affect a district court's assessment of the incentives of an administrator/insurer and therefore affect the nature of its review." *Pinto,* 214 F.3d at 383, 384 n. 3.

istrator is the person so designated by the terms of the instrument"). As evidenced by the vice president of claims for NAB-CO, his company "received and reviewed all claims for benefits for long term disability," and forwarded them to CSI for a determination on whether payments should be approved and paid. Def. supp. mem. exh. A (Alan Hill aff. ¶¶ 4, 7). In his words, "Allianz was in no way directly involved with claims administration, determination of benefits, or other claims functions." *Id.* ¶ 5.

To summarize what is presented here, Allianz, the insurer, received the paperwork and made benefit payouts. Allianz forwarded the claims to NABCO for review. NABCO retained CSI, an independent third party, to evaluate the claims, correspond directly with claimants and physicians, and make final determinations of eligibility. Defs.' mem. exh. A (Joe Practico aff. ¶ 3); defs.' supp. mem. exh. A (Alan Hill aff. ¶ 6). This arrangement does not justify the inference that "struc-

tural incentives" existed for CSI to deny plaintiff's claim. *Pinto*, 214 F.3d at 378.[22] There is no evidence to that effect.

### III. Application

■ "Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when the decision was being reviewed." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997).[23] The "plan administrator's decision will be overturned only if it is 'clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.'" *Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagen of America*, 222 F.3d 123, 129 (3d Cir.2000) (quoting *Abnathya*, 2 F.3d at 45).

■ It cannot be said based on the claim record that CSI's determination was arbitrary and capricious. Plaintiff's strongest argument is that none of the physicians who examined her reached a

---

**22.** If Allianz or NABCO both made benefits determinations and funded the plan, *Pinto* would require an evaluation of the "process by which the result was achieved." *Pinto*, 214 F.3d at 394. In *Pinto*, certain factors suggested that a conflict influenced the administrator's decision. First, the administrator "reverse[d] its own initial determination that [plaintiff] was totally disabled without receiving any additional medical information." *Pinto*, 214 F.3d at 393. Here, however, CSI received the reports of Doctors Kasner and Solomon and the reevaluation of Dr. Schultz before reversing its initial determination. Although plaintiff claims that Allianz pressured Dr. Schultz to change his mind by sending him the reports of Doctors Kasner and Solomon, pltf.'s mem. at 13, CSI contacted Dr. Schultz only after receiving a contrary conclusion from Dr. Kasner. Moreover, the administrator in *Pinto* selectively rejected evidence on the basis of which it had initially determined to award benefits, and gave special weight to the determinations of particular doctors, but not others. *Id.* at 393–94. Here,

however, each doctor recognized that plaintiff experienced health problems, and agreed that the cause was uncertain. Most significantly, the doctors concurred in their assessment that plaintiff could go back to work.

**23.** Plaintiff asserts that on June 29, 2000, she fell down and fractured her right hip, which required an open reduction internal fixation. She proffers results from a June 30, 2000 visit to her neurologist, a July 3, 2000 brain stem auditory, and a November 6, 2000 examination by Dr. James Gaul, another neurologist. However, because this evidence was not part of the record before the administrator, it cannot be considered at this time. *Mitchell*, 113 F.3d at 440 ("the relevant record on appeal is the evidence before the administrator at the time of his final denial"). It should be noted that, in its letter terminating her benefits, dated April 5, 1999, CSI gave plaintiff 60 days within which to appeal and submit additional medical information. D26. No additional information was provided to CSI. D32–D33; def.s' mem. exh. A (Joe Practico aff. ¶ 12).

definitive diagnosis, which "opened the door for the Plan Administrators to persuade [plaintiff's] physician ... that she was not totally disabled...." Pltf.'s mem. at 2. In its dealings with Dr. Schultz, however, CSI did not act improperly in requesting his reconsideration. CSI initially contacted Dr. Kasner based on Dr. Schultz' submission; and Dr. Kasner independently concluded that plaintiff could return to work.[24] D6, D9. In an attempt to reconcile the disparity in evaluations, CSI sought the opinion of Dr. Solomon. D36. Subsequently, Dr. Schultz altered his assessment after he had "taken the liberty and time to review Ms. Krause's chart in great detail." D25. There is simply nothing in the record to suggest that CSI improperly pressured Dr. Schultz.

■ Plaintiff's argument that CSI discredited the advice of Doctors Kasner and Solomon—who suggested that plaintiff should be evaluated for Meniere's disease—is unpersuasive. At all times, she had the burden of proving her continuing disability. Defs.' mem. exh. B ("[t]he benefit will be paid for the period of disability if the insured gives to the Company proof of continued ... disability."). Moreover, CSI did not have the "additional duty to conduct a good faith, reasonable investigation" into the cause of her disease. *Pinto,* 214 F.3d at 394 n. 8.[25] Therefore, CSI did not act arbitrarily in not requiring additional testing before denying her claim.

Plaintiff also maintains that defendants failed to consider Dr. Matarese's opinion. However, his findings on December 30, 1997, that plaintiff's "presentation is consistent with small vessel cerebrovascular disease," were not inconsistent with the findings of Dr. Kasner, who ultimately determined plaintiff could work in a sedentary to light work occupation. Dr. Kasner found her "pattern of nystagmus[26] ... [to be] entirely consistent with peripheral disease, ... [and that she had] extensive periventricular white matter disease." D50.

Given the agreement between the two doctors who assessed plaintiff's ability to work—that she could do so in a sedentary to light work occupation—a reasonable factfinder could not fairly conclude that the denial of benefits was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya,* 2 F.3d at 45 (quoting *Adamo v. Anchor Hocking Corp.,* 720 F.Supp. 491, 500 (W.D.Pa.1989)). Accordingly, defendants' motion for summary judgment must be granted.

---

**24.** That Dr. Kasner examined plaintiff just once is not a good reason for rejecting his evaluation.

**25.** It also appears from the record that it was plaintiff's decision not to undergo further testing with Dr. Solomon. In Dr. Gendron's memorandum, dated January 22, 1999, he requested that Lambert "call the claimant, and find out when she is due back to see Dr. Soloman. [Dr. Solomon] was expecting to see her back in the matter of the next several

weeks." D39. When Lambert called her on March 17, 1999, however, she said that she had not undergone, and did not know if she would undergo, additional testing. D23.

**26.** Nystagmus: An involuntary, rapid, rhythmic movement of the eyeball, which may be horizontal, vertical, rotatory or mixed, i.e., of several varieties. Medical Dictionary, at note 3 *supra.*