**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0223n.06
Filed: March 29, 2005

**No. 04-3105**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**


TRACEY D. LEE,

      Plaintiff-Appellant,

v.

MBNA LONG TERM DISABILITY
& BENEFIT PLAN, et al.,

      Defendants-Appellees.

_____/

| | |
|---|---|
| | **ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |

**BEFORE:**   **MARTIN and GILMAN, Circuit Judges; and COHN, District Judge**.[*]

**AVERN COHN, District Judge**.  This is a case under the Employment Retirement Income Security Act ("ERISA"), 42 U.S.C. § 1001, *et seq* seeking long-term disability ("LTD") benefits.  Plaintiff-Appellant Tracey D. Lee ("Lee") appeals from (1) the district court's decision entering judgment in favor of Defendants-Appellees MBNA Long Term Disability & Benefit Plans ("MBNA"), ING Benefit Claim Manager Duncanson & Holt

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

("D&H"), and Security Life of Denver ("Security Life") and (2) the district court's order denying Lee's motion to supplement the administrative record. For the reasons that follow, we **AFFIRM** the decisions of the district court.

## I. BACKGROUND

### A. The Framework of the Plan and Delegation of Authority

MBNA is the sponsor and administrator of the LTD plan at issue. MBNA contracted with Security Life, an insurance company, to fund the LTD plan. The insurance policy contains all of the essential provisions regarding the payment of LTD benefits and is, for all intents and purposes, the LTD plan. There is no dispute that the plan is governed by ERISA. The governing plan documents include the summary plan description ("SPD") and the insurance policy between MBNA and Security Life. As administrator, MBNA retained discretionary authority to determine benefit eligibility. The SPD provides in part:

> The Plan Administrators, or their delegates, have the exclusive discretionary authority to operate and administer the benefit plans summarized in this guide, and to determine all questions arising in connection with the plans. They also have the discretionary authority to construe the terms of the plans, to decide all questions of eligibility and participation, and to determine benefit amounts. The Plan Administrators' decision on all such matters are final. Any interpretation or determination made while carrying out their discretionary authority will be upheld on judicial review, unless it is shown that the interpretation or determination was an abuse of discretion.

The SPD further states that MBNA could delegate its discretionary authority and the delegate(s) could re-delegate the discretionary authority:

> The Plan Administrator periodically delegates discretionary authority in

2

contracts, letter, and other documents. For example, discretionary authority may be delegated to the claims administrators, insurers, and trustee listed on page 2, 4, and 5 of this section, as well as their predecessors or successors. Delegates may also assign their discretionary authority to others as allowed by the Plan Administrator.

The insurance policy also conferred upon Security Life discretionary authority:

> In making benefits determinations under the Policy, the Insurance Company shall have the discretionary authority both to determine an individual's eligibility for benefits and to construe the terms of the Policy.

MBNA delegated its discretionary authority to administer the plan to D&H.

Security Life later entered into an assumption agreement with SAFECO Life Insurance Company, which assumed liability as insurer of the LTD plan in place of Security Life. SAFECO and D&H in turn entered into a Group Long Term Disability Reinsurance Agreement ("Reinsurance Agreement") under which D&H is identified as the Managing Agent for participating reinsurers, referred to as the American Disability Reinsurance Underwriters Syndicate ("ADRUS"). SAFECO is identified as the insurer. Under a Claims Management Agreement attached as an appendix to the Reinsurance Agreement, D&H, as agent for the reinsurers, designated Claims Service International, Inc. ("CSI") to perform "claims management services," including determining benefit eligibility.[1]

In order to qualify for LTD benefits, a claimant must meet the following definition of disability:

---

[1]Effective January 1, 2002, Integrated Disability Resources, Inc. ("IDR") purchased the assets and business operations of D&H and CSI.

Total Disability or Totally Disabled means during the elimination period [180 days] and the next 36 months of disability the insured is:

1.  Unable to perform all of the material and substantial duties of his occupation on a basis consistent with his regularly scheduled hours (immediately prior to his disability) because of a disability:
    a. caused by injury or sickness
    b. that started while insured under this policy; and
2.  After 36 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

## B. Processing of Lee's LTD Claim and Relevant Procedural History

### 1.

In 1997, MBNA Marketing Systems, Inc. ("MSI") hired Lee as a part-time Customer Service Satisfaction Specialist. MSI is a subsidiary of MBNA America, which is in turn a subsidiary of MBNA. Lee's duties included answering telephone calls, preparing, reviewing, and approving customer requests for credit line increases, processing incoming mail, and tracking incoming calls. She was also required to possess strong written and oral communication skills, work in a high-volume environment, be self-motivated, and identify and resolve customer concerns.

In February of 1998, Lee was hired full-time and became eligible for coverage under MBNA's benefit plan, which included short term disability ("STD") and LTD benefits. Relevant plan provisions are set forth and discussed below.

In December of 1998, Lee applied for and received STD benefits as a result of fatigue, snoring, daytime somnolence, irregular heartbeat, and shoulder pain. Lee

4

returned to work at the end of March 1999.  In September of 1999, Lee again applied for STD benefits for sleep apnea, high blood pressure and shoulder problems.  She received these benefits until October 1999.[2]  After Lee exhausted her leave under the Family Medical Leave Act, she was placed on leave pending her application for LTD benefits.

On December 30, 1999, Lee completed an LTD claim form, on which CSI's name and address appears at the top.  Lee described her disability as follows: "walking at night unable to breath [sic] and cardiac distress several times weekly[,] extreme fatigue[,] muscle weakness[,] unable to think clearly[,] began falling asleep behind the wheel of auto each time driving."  MBNA completed its portion of the form outlining Lee's job duties on February 1, 2000, at which time it was submitted to CSI.  Lee's form was accompanied by a physician's statement of January 3, 2000 from her treating physician, Dr. Chagin, who diagnosed "sleep apnea, HTN, chronic insomnia, possible narcolepsy."  He listed restrictions of "no driving" and "nothing involving concentration for prolonged periods."

It is undisputed that Lee's alleged onset of disability, for purposes of LTD benefits, is October of 1999.

On February 14, 2000, CSI identified itself as the claims advisory agent for SAFECO, the LTD carrier for MBNA, and informed Lee that it had received her claim.

CSI also received the following medical documentation:  treatment notes from Dr.

---

[2]Lee apparently challenged the termination of her STD benefits.  However, the matter was later resolved and is not the subject of this appeal.

Chagin from February 1999 to February 14, 2000; treatment notes from Dr. Hershey, a cardiologist, from June 1999 to October 5, 2000; and three of Lee's STD forms. Dr. Hershey's records show that cardiac test results were essentially normal. Dr. Chagin's notes outline Lee's several complaints over time, and include diagnosis of sleep apnea, obesity, shoulder pain, chronic insomnia, fibromyalgia, and hypertension. None of Dr. Chagin's notes indicate that Lee's sleeping difficulties prevent her from working.

On March 27, 2000, Trina Couture at CSI documented a phone call from Lee in which she stated, *inter alia*, that her Continuos Positive Airway Pressure ("CPAP") machine was not working, she has trouble keeping it on at night, and she subconsciously removes it.

On May 9, 2000, CSI, though Couture, referred Lee's file to Dr. Barry Gendron, a consulting physician specializing in rehabilitation and physical medicine. Dr. Gendron completed a Memorandum dated May 14, 2000, in which he stated:

> It is unclear what Ms. Lee's alleged primary impairing condition is. There is no objective medical evidence to corroborate attention/concentration deficits related to sleep apnea syndrome. We also do not have the results of the sleep study to review. I see no formal neuropsychiatric or psychiatric assessment of cognitive capacity, nor do I see even a baseline mini-mental status exam attempting to document cognitive function.
>
> From the medical information available, I do not see adequate evidence from 8/99 to present which would support complete impairment from a sedentary occupation. It is entirely unclear why the claimant left work; her hypertension was under fair control and her sleep apnea was apparently fairly longstanding. It is unclear if her job/motivational issues have impacted her leaving work.

Dr. Gendron recommended obtaining results of the sleep study, as well as considering contacting her attending physician to better understand her restrictions and limitations.

6

Later in May, CSI received additional medical records relating to Lee's sleep apnea, insomnia, and possible narcolepsy. These records show that Lee was diagnosed with sleep apnea in 1998. On November 18, 1998, Lee underwent a sleep study at Akron General Medical Center at the direction of Dr. Chagin. The study documented "prolonged sleep latency" of more than one hour and found "moderately severe" obstructive sleep apnea. A repeat study was conducted on December 10, 1998 that showed that Lee's apnea was well controlled with the use of a CPAP device.

On June 6, 2000, Dr. Gendron spoke with Dr. Chagin regarding Lee's condition. The substance of the conversation is memorialized in a letter from Dr. Gendron to Dr. Chagin, also dated June 6, 2000, which Dr. Chagin signed and returned. Dr. Chagin indicated that he supported a period of disability from August 30, 1999 until September 30, 1999 relative to Lee's hypertension. After that time, Dr. Chagin indicated that her condition was well controlled and did not affect her job duties. They also discussed Lee's work restrictions, to which Dr. Chagin stated that Lee had been diagnosed in February of 1999 with left rotator cuff tendinitis and that a restriction of not lifting greater than ten pounds was in place from February 1999 to August 1999. They did not discuss Lee's sleep apnea; either Dr. Gendron did not inquire about the condition and/or Dr. Chagin did not mention it.

Also on June 6, 2000, Dr. Gendron completed a second Memorandum regarding Lee's condition. As to her sleep apnea, he stated that "[a]lthough comorbid conditions of sleep apnea syndrome and possible narcolepsy are listed, the objected evidence show that

7

she is well controlled on 10 cms of water CPAP." His summary of the condition noted that her limitation was to wear a CPAP at night. He found no evidence limiting her regarding her hypertension, tendinitis or fibromyalgia.

Based on this information, CSI denied Lee's claim in a letter dated June 21, 2000. The letter discusses Lee's treatment for hypertension and tendinitis, as well as the conversation with Dr. Chagin; it does not mention Lee's sleep apnea. Lee, through counsel, appealed the decision. Counsel for Lee wrote CSI, agreeing that her hypertension was not in and of itself disabling, but that Lee's primary disability was "sleep apnea" that had resulted in a decreased ability to concentrate, chronic fatigue, and short-term memory loss. Counsel indicated that medical records from Dr. Chagin would support her condition and would be forwarded to CSI. CSI agreed to hold the file open for 30 days for receipt of the additional information. CSI, however, did not receive any additional information. Accordingly, on September 29, 2000, CSI notified Lee that her appeal was denied. The letter references the conversation between Dr. Chagin and Dr. Gendron and states in part as follows:

> Dr. Chagin did not indicate there were any work restrictions which would carry forward with respect to the sleep apnea. The medical records reflect that your client's sleep apnea improved with treatment with the CPAP. There is no indication that a new polysomnography was done showing that the CPAP treatment from the previous polysomnogram of 12.10/98, which was effective in controlling abnormalities, was no longer valid. Nor have we been provided with any neuropsychological results outlining any cognitive impairments.

The letter further indicated that CSI would review any additional medical information received within sixty days.

8

On October 2, 2000, Lee's counsel advised CSI that he had requested a detailed medical report from Dr. Chagin and would forward it to CSI. CSI, however, did not receive such a report.

More than seven months later, on May 17, 2001, CSI received a telephone call from Lee's new counsel requesting a copy of Lee's claim file. On June 2, 2001, CSI received a copy of a letter dated September 4, 2000 that Dr. Chagin wrote to Lee's former counsel. In that letter, Dr. Chagin stated:

> Tracey Lee has been seen by me for persistent Hypertension, Chronic Fatigue, Chronic Insomnia, Fibromyalgia and Sleep Apnea. Her sleep apnea most likely is the causative problem for her other health concerns. She had persistent symptoms from her sleep apnea even though she is equipped with a home CPAP machine. She has seen a neurologist and is currently seeing an ear, nose, and throat specialist. She continues to be aggravated by fatigue, headaches and stress. Tracey is seen periodically by me to monitor response to therapy. Should you have need for further information, feel free to contact my office.

CSI also received the following information: treatment notes from Dr. Chagin through July 19, 2001; the results of a sleep study performed by Dr. Raymond Salomone on October 9, 2000; treatment notes from Dr. Frankie Roman, a sleep specialist, from July 3, 2001 to November 2, 2001; and an affidavit of Kelly Bevington, Lee's roommate, a nursing assistant. These records show that the sleep study by Dr. Salomone reported "moderately severe obstructive sleep apnea," which was treated adequately with the use of a CPAP. It also recommended that other alternatives, such as a different device or surgery, could be explored if Lee continued to have problems. Dr. Roman performed a sleep study in July 2001. The results showed "no clinically significant snoring or sleep

9

related disturbance, abnormal decreased architecture with severely decreased sleep efficiency ...." It also stated that "if the clinical suspicion for obstructive sleep apnea remains high, ...[Lee should] return to the sleep center for a repeat polysomnogram after correcting the difficulty initiating and maintaining sleep." None of Dr. Roman's or Dr. Chagin's treatment notes indicate any restriction on Lee's ability to work. However, Dr. Roman wrote a letter dated November 2, 2001 in which he opined:

> Ms. Tracey Lee has been disabled as defined by her employer's guidelines since August 1999 when she left work to the present. She has been unable and is still unable to perform the substantial and material duties of her regular occupation as a clerk. Furthermore, I am pessimistic that there will be dramatic improvement in the near future. Nonetheless we will continue to work with Ms. Lee and her other healthcare providers towards improving her overall condition.

On October 30, 2001, Dr. Gendron telephoned Dr. Salomone to discuss the October 9, 2000 sleep study. The substance of the conversation was confirmed in a letter of the same date written by Dr. Gendron and signed and returned by Dr. Salomone. Dr. Salomone confirmed the results of the sleep study that Lee had "moderately severe obstructive sleep apnea" that was controlled with a CPAP. He stated he did not believe based on the study that Lee was precluded from engaging in a sedentary occupation, such as Lee's job as customer satisfaction specialist. Dr. Salomone stated the only restriction he would impose would be that Lee not perform shift work, work around dangerous or heavy equipment, or be employed as a bus or truck driver.

Dr. Gendron attempted to contact Dr. Chagin to obtain information regarding his letter to Lee's former counsel and the statement in the June 22, 2000 letter following their

10

conversation in which he opined that Lee could return to work after October 5, 1999. Dr. Chagin, however, did not respond. Dr. Gendron submitted additional Memoranda of his review of the medical evidence on November 1, 2001 and December 27, 2001, in which he essentially concluded that Lee was not disabled. He noted that the data from Dr. Roman comes nearly two years following Lee's disability onset of August 1999 and in his opinion was not supportive of a finding of disability as of August 1999.

On February 20, 2002, CSI informed Lee of its decision to uphold the denial of benefits. Five days later, Lee filed the instant action, claiming a wrongful denial of benefits and a breach of fiduciary duty under ERISA.

**2.**

At a case management conference on July 15, 2002, Lee claimed to have new evidence supporting her claim for LTD benefits as of August 1999. The district court ordered Lee to submit the evidence to CSI for review and a final decision. Lee submitted the following additional information: treatment notes from Dr. Deborah Reed, a neurologist; a letter dated August 14, 2002 from Adele Webb; and a letter dated August 19, 2002 from Dr. Roman. Lee claimed to be disabled since August of 1999 based on newly discovered evidence of a brain lesion. Most of Dr. Reed's studies were normal or unremarkable. However, a May 14, 2002 MRI of the brain noted a "single high signal intensity lesion within the anterior aspect of the basal ganglia measuring 5 mm." The radiologist indicated that the lesion was "non specific and may be related to ischemia or demyelination." Dr. Reed diagnosed, among other things, sleep apnea and memory

problems.  Webb, a registered nurse specializing in AIDS care, submitted a letter which indicated she reviewed Lee's file (it does not appear that she saw Lee) and opined:

> Based on the appearance and exacerbation of symptoms since 1988 and the failure of conventional therapies to alleviate Ms. Lee's health concerns, it is probable that this brain lesion occurred on or around April 1998, the date of the onset of her symptoms.

Dr. Reed's August 19, 2002 letter stated that he had recently reviewed Lee's old medical records and opined that Lee's "brain lesion probably existed in 1998 and contributed to her ongoing problems."  He stated that Lee continued "to have cognitive dysfunction with decreased attention span, poor concentration and excessive daytime sleepiness."

Based on this information, CSI requested a review of Lee's file by Dr. David Webster, an independent medical expert who is board certified in psychiatry and neurology.  On October 7, 2002, Dr. Webster submitted a report in which he stated that he agreed with Dr. Reed's diagnosis of pseudodementia, but did not agree with the radiologist's assessment of the brain lesion as being ischemic or demyelinating based on its location, noting that such lesions are not uncommon in smokers or those with hypertension, such as Lee.  He also opined, contrary to Webb and Dr. Roman, that it was "physiologically impossible" for the lesion to be responsible for her sleep symptoms because lesions in the basal ganglia are not involved in sleep disorders or cognitive disorders.  He also disputed the assertion that all of her symptoms appeared in 1998, as Webb suggested.  Dr. Webster further stated that it was impossible to determine when the

12

lesion occurred. He also stated that there was no medical evidence to suggest that Lee was sufficiently impaired from performing her occupation as of August 1999.

On October 15, 2002, CSI determined that Lee was not entitled to LTD benefits as of August 1999 and therefore again denied her claim.

**3.**

A second status conference was held on October 30, 2002, where the district court permitted Lee to depose Dr. Chagin and Dr. Gendron. The case was later transferred to the docket of another district judge.

Lee filed a motion for a bench trial on her claim for benefits and a jury trial on her claim for breach of fiduciary duty. MBNA and D&H, together with Security Life, filed separate motions to dismiss and for entry of judgment on the administrative record. D&H and Security Life filed a motion to strike Lee's references in her briefs to materials outside the administrative record, including the depositions of Drs. Chagin and Adams, certain items "taken from the Internet," and references to the facts of a reported case. The district court granted in part and denied in part the motion, noting that the deposition of the doctors were permitted by the district court to establish Lee's argument regarding a conflict of interest.

Faced with the voluminous filings, on June 12, 2003, the district court ordered that no further motions would be entertained without leave of court. On June 16, 2003, Lee moved to file a favorable decision from the Social Security Administration ("SSA") issued on June 7, 2003. The district court denied the motion on the grounds that it was

13

not part of the administrative record. Lee moved for reconsideration, which was also denied.

On December 30, 2003, the district court issued an opinion denying Lee's motion for a bench trial and a jury trial and granting defendants' motions for entry of judgment on the administrative record. The district court found that Lee's ERISA claim for breach of fiduciary duty failed as a matter of law, that she had not pled a state-law claim for breach of fiduciary duty, that the arbitrary and capricious standard of review applied, there was no conflict of interest, and CSI did not act arbitrarily or capriciously in denying her LTD claim.

Lee appeals from the district court's December 30, 2003 order as well as its order denying her motion to file her favorable SSA decision.

## II.  ANALYSIS

### A.  Standard of Review

This court reviews a decision of a district court in an ERISA benefits case *de novo*. *Gatlin v. National Healthcare Corp.*, 248 F.3d 1148 (6th Cir. 2001) (citing *Paul Revere Life Ins. Co. v. Brock*, 28 F.3d 551, 553 (6th Cir. 1994)).

### B.  Whether there was a proper delegation of claims authority to CSI

Lee argues that there was an improper delegation of discretionary authority by defendants that, as a result, requires that this Court review her claim *de novo*.

It is well established that an ERISA fiduciary may delegate its fiduciary responsibilities to either another named fiduciary or a third party if the plan establishes

14

procedures for such delegation. *See* 29 U.S.C. § 1105(c)(1).[3] In *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283 (9th Cir. 1990), the court rejected the plaintiff's position that a delegate of such authority was not entitled to the same discretionary review as (admittedly) was the original named fiduciary. Rather, the court held that where a named fiduciary with discretionary authority "properly designates another fiduciary," then discretionary review "applies to the designated ERISA-fiduciary as well as to the named fiduciary." *Id*. at 1283-84. *See also Bayer v. Holcroft/Loftus, Inc.*, 769 F. Supp. 225, 229 (E.D. Mich. 1991) ("[t]he same arbitrary and capricious standard applies even though [original administrator] delegated to [designee] its duty of interpreting the Plan as to benefits").

Here, the plan provisions set forth above clearly show that MBNA, as plan administrator and fiduciary, had the authority to delegate its fiduciary responsibilities and that its delegates could in turn re-delegate their authority provided MBNA "allowed" the re-delegation. The record shows that MBNA delegated its claims administration function to D&H that in turn delegated it to CSI. Lee says this was improper for several reasons.

Lee first argues that D&H was not a fiduciary at all because it is a life and health reinsurance company and a managing agent of ADRUS and its members and therefore could not have delegated its authority. Lee cites no authority for this argument and

_____

[3]This section provides in part:
the instrument[s] under which a plan is maintained may expressly provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities.

15

indeed there is no authority that states that an entity such as D&H cannot be a fiduciary.

Lee next argues that the delegation from D&H to CSI was improper because there are no documents indicating MBNA's authorization of the delegation to CSI. This argument also fails. There is nothing in ERISA that requires a re-delegation be in writing; what is required is, if delegation is desired, that the instrument provide for the delegation procedures. *See* 29 U.S.C. § 1105(c)(1). Here, the plan documents set forth such a procedure – the plan administrator may delegate its authority "in contracts, letters, and other documents" and "delegates may also assign their discretionary authority to others as allowed by the Plan Administrators." Thus, while a delegation from the MBNA to another entity may be evidenced in a contract, letter, or other document, there is no similar provision for a re-delegation. The only requirement is that the re-delegation be "allowed" by MBNA. MBNA clearly "allowed" the delegation as evidenced by MBNA submitting claim forms to Lee bearing CSI's name and the communications between CSI, Lee, and MBNA in the record regarding her claim. Thus, rather than establishing a procedural irregularity, as Lee seems to suggest, the record shows that the procedure for delegation and re-delegation used here was entirely consistent with relevant plan provisions. Again, a delegation need not be in writing if the plan does not call for a writing. *See Hensley v. Northwest Permanente P.C. Ret. Plan & Trust*, 258 F.3d 986, 998 (9th Cir. 2001) (noting that delegation of discretionary authority under an ERISA plan need not be in writing where plan did not require delegation to be in writing). Thus, the delegation from D&H to CSI was not improper or in violation of ERISA.

16

Lee also argues that the delegation from D&H to CSI was not a delegation of discretionary authority, and therefore CSI was not truly a fiduciary, because the delegation language only said CSI would perform "claims management services." Lee, however, provides no authority for her argument, nor is there any provision in ERISA that requires that delegations of discretionary authority contain certain operative, or magical, language.

Finally, the caselaw upon which Lee relies is distinguishable. In *Rubio v. Chock Full O'Nuts Corp.*, 254 F. Supp. 2d 413 (S.D.N.Y. 2003), the plan expressly provided that only the employer's board of directors or a committee appointed by the board could interpret the benefit plan and determine eligibility. Because the plan did not allow for further delegation, the court held that the claimant was entitled to *de novo* review. Here, as stated above, the plan allowed for delegation and re-delegation. In *Doe v. Travelers Ins. Co.*, 971 F. Supp 623, 635 (D. Mass. 1997), the court found that the entity that actually decided the plaintiff's benefits claim was "concealed" and therefore *de novo* review applied. That clearly is not the case here. Lee was well aware of CSI.

In short, because the delegation of discretionary authority was proper, Lee is not entitled to *de novo* review of her claim on this ground. The district court did not err in concluding the same.

## C.  What is the appropriate standard of review for CSI's decision

Because we conclude that Lee is not entitled to *de novo* review based on an alleged improper delegation, or on the allegation that CSI was not a proper fiduciary, the only

17

issue remaining regarding the standard of review requires an examination of the plan

documents to determine whether CSI was granted discretionary authority.[4]  As noted

above, the plan conferred upon the plan administrator the authority to determine benefits

and construe the terms of the plan.  The language of the SPD is sufficient to invoke the

arbitrary and capricious standard of review.[5]  *See Firestone Tire & Rubber Co. v. Bruch*,

489 U.S. 101, 115 (1989); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir.

1991).

The arbitrary and capricious standard is the "least demanding form of judicial

review."  *Admin. Comm. of the Sea Ray Employees Stock Ownership and Profit Sharing

Plan v. Robinson*, 164 F.3d 981, 989 (6th Cir. 1999).  A decision regarding eligibility for

benefits is not arbitrary and capricious if the decision is "rational in light of the plan's

provisions."  *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).  *See also Yeager

v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).  Stated differently,

"[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a

particular outcome, that outcome is not arbitrary or capricious."  *Davis v. Kentucky

---

[4] To the extent that Lee argues she is entitled to a bench trial on her ERISA claim, this argument lacks merit.  It is well settled in this Circuit that denial of benefit claims are decided in accordance with the procedure set forth in *Wilkins v. Baptist Healthcare Sys. Inc.*, 150 F.3d 609, 618-19 (6th Cir. 1998), which requires the district court to render findings of fact and conclusions of law based on the administrative record; there is no provision for a bench trial.

[5] The SPD states that judicial review will be for "an abuse of discretion," which, for practical purposes, essentially confers an arbitrary and capricious standard of review.

*Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks and citation omitted). *See also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*).

### D. Whether CSI was operating under a conflict of interest

Lee argues that CSI was operating under a conflict of interest because it was acting for the interests of certain reinsurers (Allianz, a member of ANDRUS) and SAFECO who were ultimately responsible for paying Lee's benefits. Lee also says that a conflict exists because CSI was the agent for D&H, which in turn was the managing agent for ADRUS.

Lee is correct that if a conflict of interest exists, this factor must be taken into account in determining whether the decision to deny benefits was arbitrary or capricious. *See Miller*, 925 F.2d at 984.

Here, SAFECO assumed Security Life's liability under the MBNA LTD plan via an assumption reinsurance agreement. CSI itself was not responsible for paying benefits. Moreover, as the district court noted, even if D&H is affiliated with CSI, CSI, not D&H, decided the claim and D&H delegated it discretion to CSI. Thus, there does not appear to be a conflict of interest under the circumstances. *See Krause v. Modern Group, Ltd.*, 156 F. Supp. 2d 437 (E.D. Pa. 2000) (holding that a similar relationship where CSI was delegated claims authority did not create a conflict of interest).

Regardless, even assuming, *arguendo*, that CSI was operating under a conflict of interest vis-a-vis its relationship with D&H, SAFECO, and ANDRUS, this is only a factor to be considered. As will be explained, CSI did not abuse its discretion in denying Lee's

19

claim. This conclusion is not altered even if CSI was acting under a conflict of interest.

### E. Whether CSI's decision was correct under the appropriate standard of review

The next issue, which really forms the heart of this appeal, is whether CSI's decision denying Lee's claim for LTD benefits was arbitrary and capricious. It is important to note that in order to be eligible for benefits, Lee must show that she met the definition of disability under the plan as of her onset date of August 1999.

Regarding this, Lee first argues that CSI erred because it failed to give sufficient weight to the opinions of Dr. Roman, her treating physician. "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citing *Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965 (2003)). Under *Nord*, CSI was not required to give Dr. Roman's opinion any special weight. Moreover, CSI had the opinions from Dr. Salomon and Dr. Webster who both found that Lee's sleep apnea did not preclude her from working at her former occupation. Under these circumstances, CSI was free to favor these opinions over Dr. Roman's without being found to have acted arbitrarily.

It is notable that Lee focuses only on the evidence of her sleeping disorders, and

20

problems in concentration stemming therefrom, as the basis for her disability. Thus, the evidence relating to her hypertension and tendinitis will not be discussed, as it is assumed and confirmed by the record that these conditions were not disabling.

As to her sleep apnea, the record contains conflicting evidence of whether or not it is disabling. Notable also is Dr. Chagin's altering opinion of Lee's sleep condition. In June 2000, he said in his conversation with Dr. Gendron that Lee's only work restriction was related to her tendinitis. Lee characterizes this conversation as one in which Dr. Gendron "snookered" or "actively deceived" Dr. Chagin into not discussing Lee's sleep problems. This contention is difficult to support in light of the fact that Dr. Chagin signed the letter prepared by Dr. Gendron memorializing the conversation, indicating his agreement. Dr. Chagin knew the purpose of the conversation was to discuss Lee's restrictions and ability to work and that Dr. Gendron was reviewing her file for that purpose. Certainly, it would appear that if Dr. Chagin believed that Lee's sleep apnea affected her ability to work, it would have been logical for him to so inform Dr. Gendron. Then, just months later, in September 2000, Dr. Chagin stated that Lee's sleep apnea is the cause of her other health problems, but he does not state that she is disabled and he failed to point to any medical evidence. Dr. Chagin's January 25, 2002 letter affirmatively stated that Lee has been disabled since August 1999 and that Lee suffers from sleep apnea. Again, Dr. Chagin did not point to any medical evidence in support.

Moreover, the results of the sleep studies fail to establish that CSI acted arbitrarily or capriciously. The December 1998 and October 2000 sleep studies were closer in time

21

to Lee's onset date and both demonstrated her condition was controlled with a CPAP.  Dr. Salomon opined following the October 2000 study that Lee was not precluded from sedentary work.  The fact that CSI credited these studies over Dr. Roman's opinion, which was conducted years after her onset date, was not arbitrary.

As to her brain lesion, the record was also conflicting on whether it was a cause of her sleep apnea and when it first manifested.  In light of the conflicting evidence, CSI was not arbitrary in crediting Dr. Webster's opinion over than of Dr. Roman and Webb.

Having carefully reviewed the record, we agree with the district court that CSI's decision to deny Lee's claim for LTD benefits was not arbitrary or capricious in light of the medical evidence and plan provisions.  CSI's decision was the result of a reasoned process that considered all of the medical evidence.  Indeed, CSI afforded Lee several opportunities to submit additional evidence and reviewed all the evidence she submitted.  It is important to note that the issue is not whether Lee suffers from any medical conditions, but rather whether CSI's determination that Lee's medical conditions did not meet the definition of disability under the plan was arbitrary and capricious.

### F.  Whether Lee stated a claim for breach of fiduciary duty under ERISA and state law

Lee also argues that the district court erred in finding that Lee failed to state a claim for breach of fiduciary duty under ERISA and state law.  The district court dismissed Lee's breach-of-fiduciary duty claim under ERISA and found that she failed to allege a breach-of-fiduciary duty claim under state law.

22

Lee claimed a breach of fiduciary duty under ERISA, 29 U.S.C. §§ 1109 and 1132(a)(3). Section 1109 deals with liability for breach of fiduciary duty and provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach ... and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary ....

29 U.S.C. § 1109(a). Section 1132(a)(3) provides that a civil action may be brought:

> [B]y a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3).

The Supreme Court limited the relief afforded by § 1132(a)(3) to plan participants or beneficiaries are not able to avail themselves of other remedies under § 1132. *See Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). In *Wilkins*, *supra*, this Circuit adopted the reasoning of *Varity* and noted that § 1132(a)(1)(B) already provides a remedy for a claimant who alleges that his benefits were wrongly denied; such a claimant does not have an additional claim for breach of fiduciary duty pursuant to § 1132(a)(3). *Wilkins*, 150 F.3d at 615. It is clear that an ERISA claimant may not recharacterize a denial of benefits claim as a claim for breach of fiduciary duty. *See id.* at 616 (citing *Varity*, 516 U.S. at 514-15).

23

Here, Lee had a cause of action for denial of benefits under § 1132(a)(1)(B). Lee cannot also characterize CSI's denial of LTD benefits as a breach of fiduciary duty. Moreover, because Lee has not shown any improper delegation of fiduciary authority by MBNA and D&H, her breach of fiduciary duty claim arising out of this allegation must fail.

As to a claim under state law, the district court examined Lee's Fourth Amended Complaint and found no affirmative allegations that would constitute a discrete claim for breach of fiduciary duty under state law. We agree. The only possible reference to state law in the complaint is contained in her jurisdictional statement that "if this court lacks subject matter under ERISA, [it has] supplemental jurisdiction under 28 U.S.C. § 1367." Later in the complaint, Lee makes a reference to defendants acting in bad faith, but does not refer to state law. Indeed, Lee states her claims are "to recover benefits, for injunctive relief, and for breach of fiduciary duty under ERISA." Lee simply did not plead a state-law breach-of-fiduciary duty claim. Although Lee cites Fed. R. Civ. P. 1 and argues that her complaint should be liberally construed in the interests of justice, there is no basis for construing her clearly drawn ERISA complaint as alleging a claim under state law.

Moreover, even if Lee had pled a state-law breach-of-fiduciary duty or bad-faith claim, it would have failed as a matter of law as preempted under ERISA. ERISA preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan [governed by ERISA]." 29 U.S.C. § 1144(a). The Supreme Court and this Circuit have clearly held that a state-law claim for breach of fiduciary duty

and/or bad faith are preempted. *See Pilot Life Ins. v. Dedeaux*, 481 U.S. 41 (1985)

(holding that bad faith claim arising out of failure to pay benefits was preempted under

ERISA);

*See Smith v. Provident Bank*, 170 F.3d 609, 612-13 (6th Cir. 1999) (holding that

"[c]ommon law breach of fiduciary duty claims are clearly preempted by ERISA.")

### G.  Whether the district court was correct in not allowing Lee to submit a favorable decision of the SSA

Lee argues that the district court erred in not permitting her to file a favorable

decision from the SSA awarding her Social Security benefits.  The district court ruled that

the decision could not be made a part of the record because it clearly was not part of the

administrative record at the time of its decision.  The district court was entirely correct.  It

is settled that a court's review is limited to the evidence before the plan administrator as

contained in the administrative record.  *See Wilkins*, 150 F.3d at 516.  Because this

evidence is not part of the administrative record, it cannot be considered.  Second, the fact

Lee was awarded Social Security benefits under the SSA's rules does not necessarily

mean that she was disabled under the plan's definition of disability.  *See Whitaker v.

Hartford Life and Accident Ins. Co.*, ___ F.3d ___, 2005 WL 147076 (6th Cir. Jan. 24,

2005).  Thus, even if Lee's favorable SSA decision was part of the administrative record,

CSI would not be bound by it and the decision would likely not support a finding that

CSI's denial of benefits was arbitrary or capricious.

### III.  CONCLUSION

25

For the reasons stated above, we **AFFIRM** the decisions of the district court.